[No. B131431. Second Dist., Div. One. Sept. 27, 1999.]

ICF KAISER ENGINEERS, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SEPULVEDA HATTERAS, LTD., et al., Real Parties in Interest.

**COUNSEL**

Sheppard, Mullin, Richter & Hampton, Robert J. Stumpf, Jr., Steven H. Winick; Bronson, Bronson & McKinnon and Paul J. Sanner for Petitioner.

No appearance for Respondent.

Lipofsky & Ruben, Louis A. Lipofsky and Mark L. Share for Real Parties in Interest.

**OPINION**

**VOGEL (Miriam A.), J.**—A general contractor agreed to do some work for an owner. The work was done by the contractor, after which the owner paid part but not all of the contractor's fees. As they had agreed in advance, the

parties then arbitrated their dispute before a distinguished panel of three arbitrators, where the contractor prevailed. When the contractor filed a petition to confirm the arbitrators' award, the owner alleged—for the first time—that the contractor's license had been suspended at the time the contract was entered and while the work was being performed. This came as a surprise to the contractor, and the petition to confirm the award was withdrawn so the matter could be investigated. The owner then petitioned to vacate the arbitrators' award. The contractor opposed that petition, claiming substantial compliance with the licensing statute. An evidentiary hearing was held, after which the trial court entered judgment for the owner and vacated the arbitrators' award. The contractor applied to us for an extraordinary writ. We grant the contractor's petition.

## FACTS

In October 1995, ICF Kaiser Engineers, Inc. (Kaiser) agreed to and did perform earthquake remediation work for Sepulveda Hatteras, Ltd., a partnership.[1] By the time the project was concluded, Kaiser had billed Sepulveda about $1.9 million. By October 1996, Sepulveda had paid about $700,000, leaving about $1.2 million still due to Kaiser. As they had agreed they would in the event of a dispute, the parties submitted the matter to arbitration. On August 28, 1998, the arbitration panel (James Acret, a lawyer specializing in construction disputes, and two retired judges, Hon. George M. Dell and Hon. Leon Savitch) awarded $800,000 to Kaiser. On September 14, Kaiser filed a petition to confirm the arbitration award.[2]

In opposition to Kaiser's petition, Sepulveda contended that Kaiser's claim was barred because (according to the records of the Contractors' State License Board) Kaiser's contractor's license had been suspended at the time the contract was entered and during the construction period (specifically,

---

[1]Sepulveda's general partner, Jay Steinbeck, is included in our subsequent references to Sepulveda.

[2]Meanwhile, on October 16, 1996, Kaiser had recorded a mechanic's lien and, on January 14, 1997, had filed an action to foreclose that lien (Super. Ct. L.A. County, No. LC039824). On the same day it filed its complaint, Kaiser had also filed an application to stay the foreclosure action pending the arbitration, and that application was granted on January 15, 1997 (as a result of which Sepulveda did not file an answer until November 2, 1998, at which time it also filed a cross-complaint). After the arbitration, Kaiser initiated a new proceeding when it filed its petition to confirm the arbitrators' award (Super. Ct. L.A. County, No. LS007630). Both cases were assigned to the same trial judge. Kaiser's plan, had it obtained the requested confirmation, was to enforce its personal judgment against Sepulveda and its principals while at the same time pursuing summary judgment to foreclose its mechanic's lien against the property. Insofar as we are concerned, the issue is the same in both cases— whether the suspension of Kaiser's license affects its ability to recover anything, on any theory, from Sepulveda or its principals.

from September 22, 1995, to February 15, 1996).[3] Kaiser, in turn, took its petition off-calendar in order to determine the basis for Sepulveda's claim and the reason for the problem with the Board's records. Several months later, Sepulveda filed a petition to vacate the arbitration award (in the mechanic's lien action, not the action in which Kaiser's petition to confirm had been filed). Kaiser opposed the petition to vacate. By the time of the hearing on that petition, the evidence before the trial court established that Kaiser, a subsidiary of ICF Kaiser International, Inc., is an international engineering and construction firm. As such, it must comply with the licensing requirements imposed by each state in which it does business. At the times relevant to this dispute, the employee primarily responsible for processing the paperwork necessary to obtain and maintain Kaiser's licenses was Catherine Howland, a clerk in Kaiser's legal department.

Leaving to one side whether Kaiser should have known there was a problem with its license, the evidence is undisputed that, until the time Sepulveda opposed Kaiser's motion to confirm the arbitration award, Kaiser had no actual knowledge that its license had been suspended, and everyone involved believed that Kaiser was properly licensed. Although it usually did so when there was any problem (albeit as a courtesy and not because it was required to do so), the Board did not issue a Notice of Suspension that would have put Kaiser on notice of a problem. In fact, as the result of a computer glitch, the Board itself was (for all practical purposes) unaware of the problem and, as will appear, an inquiry to the Board during the time of the "suspension" would have elicited a response that Kaiser's license was in good standing.

The problem that resulted in the suspension occurred because Kaiser, as a corporation, can qualify for a contractor's license only through a "responsible managing officer" (RMO) or "responsible managing employee" (RME) who meets the Board's requirements for a contractor's license. (§ 7068, subd. (b)(3).) The RMO or RME (the qualifier) must be an officer or employee of the corporation, and must be actively engaged in the work covered by the license. (§§ 7068, subd. (d), 7068.1.) Until June 24, 1995, Kaiser's qualifier was Richard Scott Hergenrader, but Hergenrader's association with Kaiser ended on June 24. Hergenrader's disassociation triggered a 90-day period within which Kaiser had to replace him with another

---

[3]Under subdivision (a) of section 7031 of the Business and Professions Code, a person who is required by law to be licensed as a contractor may not recover in law or equity for the performance of work performed as a contractor unless he was a duly licensed contractor "at all times during the performance" of the contract under which he claims compensation. Subdivision (d) of the same statute, which addresses the issue of "substantial compliance," is discussed at length below. All subsequent statutory references are to the Business and Professions Code.

qualifier or suffer a suspension of its license. (§ 7068.2 [if a corporation's qualifier leaves the corporation's employ, the corporation or the qualifier must notify the Board in writing, and the corporation must replace the qualifier within 90 days by filing a new application designating the new qualifier].) On July 18, Kaiser submitted an application to the Board to substitute Christopher Meyer as its qualifier. Meyer, who had not taken the necessary licensing examination, was scheduled by the Board to take the test on October 10 (more than three weeks before Kaiser entered its contract with Sepulveda).

On August 14, the Board returned Kaiser's application to substitute Meyer for Hergenrader, explaining that the application could not be processed because there had been no formal notification of Hergenrader's departure from Kaiser. Kaiser resubmitted the application, this time accompanied by a notice of Hergenrader's disassociation, but the paperwork was returned again on September 13, this time because Kaiser had failed to identify the effective date of Hergenrader's disassociation. On September 19, Kaiser resubmitted its application, which was accepted. On September 20, the Board sent Kaiser a form notice confirming the date of Hergenrader's disassociation and advising Kaiser that its license would be suspended unless, within 90 days from the date of disassociation (that is, by September 22), Hergenrader was replaced with a qualified RMO. In the same notice, the Board advised Kaiser that it had received and was processing Meyer's application to serve as Kaiser's qualifier.

On October 10, Meyer took and passed the examination. On the same day, the Board notified Kaiser that it had satisfied the necessary requirements to replace its qualifier and that, by January 9, 1996, it should submit a "Bond of Qualifying Individual (Q.I. bond). (§ 7074, subd. (e) [an application for a change of qualifier becomes void if the applicant, after notice to do so, fails to file a Q.I. bond within 90 days from the date of the notice].) On October 18, the Board notified Kaiser that the Q.I. bond had to be received by January 16, 1996 (not January 9) and, in the same notice, requested specified insurance certificates, which were submitted by Kaiser on October 23, 1995.

On October 26, the Q.I. bond for Meyer was issued and sent by the surety to Catherine Howland at Kaiser. As the result of a clerical oversight, the bond was not submitted by Howland to the Board (years later, the original bond, dated October 26, 1995, was found in Kaiser's licensing file), and was not in the Board's possession on October 30, the date Kaiser entered its contract with Sepulveda. The Bond nevertheless remained in full force and effect and was finally accepted by the Board on February 15, 1996. According to the Board's current records, Kaiser's license was suspended from

September 22, 1995, until February 15, 1996 (although, as noted, neither Kaiser nor the Board was aware of the suspension at that time).

At the hearing on Sepulveda's motion to vacate the arbitration award, the trial court rejected Kaiser's contention that it had substantially complied with the licensing requirements within the meaning of subdivision (d) of section 7031 and granted Sepulveda's motion to vacate. Since Sepulveda's motion was made in the mechanic's lien action, the trial court signed and filed a judgment granting the motion to vacate the arbitration award, reciting that Kaiser would take nothing by its complaint in the mechanic's lien action, and also reciting that Kaiser would take nothing by its petition to confirm the arbitration award in the other action. The judgment released Sepulveda's property from the mechanic's lien.

In March 1999, Kaiser filed timely notices of appeal in both cases. Shortly thereafter, Sepulveda notified Kaiser of its intent to file a motion to dismiss the appeal in the mechanic's lien action on the ground that the judgment entered in that case did not dispose of Sepulveda's cross-complaint (so that the judgment was not a final appealable order). The parties' lawyers then decided to take a rational approach to the overriding issue, with Sepulveda ultimately agreeing that it would support Kaiser if Kaiser filed a petition for a writ of mandate in which it asked us to finally resolve the licensing issue in an expeditious manner. The within petition was then filed, followed by a statement from Sepulveda confirming its joinder in a request for resolution of the licensing issue at this time. We then issued an order to show cause, set the matter for hearing, and received further briefing from both sides.

DISCUSSION

A. *The Statute*

As relevant, section 7031 provides: "(a) Except as provided in subdivision (d), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person . . . . [¶] . . . [¶] (d) The judicial doctrine of substantial compliance shall not apply under this section where the person who engaged in the business or acted in the capacity of a contractor has never been a duly licensed contractor in this state. However, *the court may determine that there has been substantial compliance with*

*licensure requirements under this section if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, and (3) did not know or reasonably should not have known that he or she was not duly licensed. . . ."* (Italics added.)[4]

### B. The Purpose of the Licensing Law

■ As our Supreme Court explained in *Hydrotech Systems, Ltd.* v. *Oasis Waterpark* (1991) 52 Cal.3d 988, 995 [277 Cal.Rptr. 517, 803 P.2d 370], "[t]he purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.] [¶] Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work. The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay.

"Because of the strength and clarity of this policy, it is well settled that section 7031 applies despite injustice to the unlicensed contractor. 'Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any*

---

[4]When subdivision (d) was first added to section 7031 in 1989, it eliminated altogether the doctrine of substantial compliance. (Stats. 1989, ch. 368, § 1, p. 1509 [the "judicial doctrine of substantial compliance shall not apply to this section"].) In 1991, subdivision (d) was amended to provide that a court could "determine that there has been substantial compliance with licensure requirements, for purposes of this section, if it is shown at an evidentiary hearing that the person was a duly licensed contractor during any portion of the 90 days immediately preceding the performance of the act or contract for which compensation is sought, that the person's category of licensure would have authorized the performance of that act or contract, and that noncompliance with the licensure requirement was the result of (1) inadvertent clerical error, or (2) other error or delay not caused by the negligence of the person. . . ." (Stats. 1991, ch. 632, § 1, p. 2936; *Construction Financial* v. *Perlite Plastering Co.* (1997) 53 Cal.App.4th 170, 177-178 [61 Cal.Rptr.2d 574] [applying the 1991 version of the statute].) Most recently, subdivision (d) was amended in 1994, this time to read as quoted in the text. (Stats. 1994, ch. 550, § 1.) The 1994 (current) version of subdivision (d) applies to our case. (§ 7031, subd. (e).) Although the parties disagree about whether the 1994 amendment limits or expands the concept of "substantial compliance" in the context of this case (Cal. Mechanics' Liens and Related Construction Remedies (Cont.Ed.Bar 1998) §§ 2.26, 2.5 pp. 32, 45), we need not (and do not) resolve that debate. As will appear, our review of the record shows the absence of any evidence to support the trial court's findings, and also shows that a failure to find substantial compliance on the evidence that *was* presented would read the provision right out of the statute.

*harshness between the parties,* and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state. . . .' [Citations.]"[5]

## C. *The Trial Court's Findings*

■■■■■■ The question before us is whether the evidence supports the judgment. (*Construction Financial* v. *Perlite Plastering Co., supra,* 53 Cal.App.4th at p. 179.)[6] Although there are three elements to the rule of substantial compliance set forth in section 7031, subdivision (d), only one of those elements is at issue. The first element—whether Kaiser was duly licensed as a contractor in this state prior to the performance of the Sepulveda contract—was not disputed by Sepulveda and it is clear from the evidence that Kaiser was, in fact, properly licensed until September 22, 1995. The second element—whether Kaiser acted reasonably and in good faith to maintain proper licensure—was answered in the affirmative by the trial court and is therefore not an issue on these writ proceedings. That leaves only the third element—whether Kaiser "did not know or reasonably should not have known that [it] was not duly licensed." (§ 7031, subd. (d).) These are the trial court's oral findings, made at the conclusion of the hearing on Sepulveda's motion to vacate the arbitration award (there are no written findings):

". . . I . . . conclude that [Kaiser] did not comply with [section] 7031[, subdivision] (d), especially with regard to the third prong. [¶] To argue that [Kaiser] did not know or reasonably should not have known that [it] was not duly licensed requires the kind of conversation that we have had here today,

---

[5]*Hydrotech* is factually inapposite. There, the issue was whether an unlicensed nonresident was entitled to sue upon an isolated transaction, notwithstanding any claim of substantial compliance. The Supreme Court held there was no implied exception for foreign entities, isolated transactions, or other "exceptional circumstances." (*Hydrotech Systems, Ltd.* v. *Oasis Waterpark, supra,* 52 Cal.3d at p. 992.) There was no substantial compliance issue in *Hydrotech.*

[6]As we explained in *Lindenstadt* v. *Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 889-892 [64 Cal.Rptr.2d 484], the rules that give finality to an arbitrator's determination of ordinary questions of fact and law do not apply where the issue of the legality of the entire transaction is raised in a proceeding for the enforcement of the arbitrator's award. In that event, the trial court may review the evidence de novo, and should consider the arbitration award itself plus all of the evidence submitted to it, regardless of whether that evidence was before the arbitrator. (*Id.* at p. 893, fn. 8.) In *Lindenstadt,* the question was whether an individual was precluded from recovering a finder's fee because he had acted as an unlicensed broker. Substantively, the case is indistinguishable from the issue now before us, and the standard of review must thus be the same here as it was there. For the record, however, we note that Sepulveda's counter-claim filed in the arbitration proceedings, did not raise the licensing issue, which was not raised until Kaiser filed its petition to confirm the award.

which has extended, given our lunch break, since about 9:30 this morning and it's now 3:00 o'clock. [¶] Giving every credence to Ms. Howland and Mr. Meyer and their beliefs, I believe that the evidence shows that [Kaiser] was simply not licensed as of October 30th of '95. And the issues which you have addressed, gentlemen, are issues that the Legislature I believe has attempted to define by the passage of these various statutes.

"However, this court again has great difficulty in concluding that a license is acquired by the mere commencement of a process or during the process to obtain an appropriate qualifier status. [¶] Looking at all of these statutes and understanding that they are to be integrated as best as possible, it just seems the more reasonable approach to this court, and I respect any disagreement with this court's conclusion, that the more reasonable interpretation is that the Legislature has announced through these various statutes certain rules and regulations.

"They have announced a process whereby licensure or the substitution of a qualifier can be obtained. I do not believe that the Code sections of 7068.2 and 7074 do away with 7031 and/or 7031[, subdivision] (d). I think that these Code sections are not inconsistent with each other, but that these Code sections define what [Kaiser] must do to have a license. And in [sections] 7068.2 and 7074 define how they can go about doing that. And any failure or inability or—to do that then results in the severe penalties imposed by [section] 7031.

"And I would think that when one looks at [section] 7031[, subdivision] (d) and interfaces that with . . . 7068.2 and 7074, that one cannot conclude that there has been substantial compliance as a result of the commencement of the process to obtain substantial compliance. It becomes somewhat circuitous, in the mind of this court, anyway. [¶] I imagine there is more that could be said at this point in time, but I think we have covered the subject well enough. You have your record on appeal."

In plain English, the trial court's only real finding is that the mere commencement of the process to substitute one qualifier for another is insufficient by itself to establish substantial compliance. Whatever merit there may be to that statement in the abstract, it does not address the other arguments advanced by Kaiser or the plain language of the statute.[7]

---

[7]In her declaration filed in support of Kaiser's position, Howland stated her personal belief that, by initiating the process to substitute Meyer as Kaiser's qualifier, she had done

## D. *The Evidence*

█ Because the trial court focused on the third element of the substantial compliance rule spelled out in subdivision (d) of section 7031 and found, in effect, that Kaiser knew or reasonably should have known that the Board had suspended *its* license (and because Sepulveda concedes this is the dispositive point), the issue before us is whether the evidence supports that finding. (§ 7031, subd. (c) [if licensure is controverted, the proof of licensure is on the licensee] see also *Buzgheia* v. *Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 389 [70 Cal.Rptr.2d 427].)[8] The undisputed evidence establishes the following facts:

— Kaiser is a billion-dollar international company with over 4,000 employees doing business in ten or more states. Typically, Kaiser's work requires it to conform to the licensing requirements of each state in which it does business. In 1995, Kaiser's California in-house legal department was staffed by two lawyers and a clerical employee sometimes referred to as the "Administrator of Licensing," the aforementioned Catherine Howland.[9]

---

everything required to be done to prevent a suspension of Kaiser's license. While we agree with the trial court that the mere commencement of the process to substitute qualifiers is insufficient, Howland's testimony was offered as evidence of the reasonableness of her belief, not as an argument about the law. The fact that Sepulveda chose to attack Howland's belief as an issue of law rather than one of fact may deserve mention, but it is not dispositive of the factual or legal issues. The trial court never found that Howland's belief was unreasonable, and it never considered whether, independent of this nonissue, Kaiser had substantially complied with the licensing requirements within the meaning of subdivision (d) of section 7031.

[8]Sepulveda's position seems to be that Kaiser actually *knew*, at the time the contract was entered and thereafter, that its license was suspended. The record shows otherwise. In fact, it is uncontroverted that Kaiser (that is, its employees, including Meyer and Howland) did not have actual knowledge of the suspension until Sepulveda filed its opposition to Kaiser's motion to confirm the arbitration award. Indeed, as we have noted, not even the Board was fully aware of the suspension at the time it was in effect. Accordingly, the real issue is whether there is substantial evidence to support the trial court's implied finding that Kaiser *should have known* about the suspension.

[9]Howland worked for Kaiser from 1989 to 1997. Her duties included "the coordination and the processing of documents and maintaining the proper licensing documentation between [Kaiser] and state licensing boards to maintain [Kaiser's] contractors' license . . . in good standing in all of the states in which the company maintained licenses, approximately 15 states in all. [She] would take prompt action on any licensing problem that came to [her] or the company's attention. In addition, [she] maintained close contact with the licensing boards of the various states, particularly California, and made numerous trips to the California Contractors State License Board . . . offices in Sacramento to ensure compliance with all licensing requirements. To facilitate [her] dealings with the Board, [she] was appointed Assistant Secretary of [Kaiser] for the period of September 27, 1995 to July 22, 1997." Howland is not a lawyer.

Issues about Kaiser's licensing were the shared responsibility of Meyer and the legal department (within which Meyer dealt with Howland).[10]

— From some point prior to March 21, 1995, until June 24, 1995 (at which time he departed from Kaiser's employment), Hergenrader was Kaiser's qualifier. On July 18, Kaiser submitted an application to substitute Meyer in place of Hergenrader. Meyer's examination was scheduled by the Board for October 10.

— On August 14, the application was returned because the Board had not been advised (by Kaiser or Hergenrader) of Hergenrader's disassociation, then resubmitted by Kaiser with a notice of Hergenrader's disassociation. On September 13, the application was again returned to Kaiser, this time because Kaiser had failed to state the effective date of Hergenrader's disassociation. On September 19, the application was resubmitted by Kaiser and accepted by the Board.

— On September 20, 1995, the Board sent an official notice to Kaiser's legal department. It stated: "Our records have been noted of the disassociation of Richard Scott Hergenrader effective 6-24-95. Failure to replace him by 9-22-95 will result in suspension of the license. [¶] We are currently processing an application for Christopher Meyer to become the new qualifier on the license." Howland never interpreted this notice "as an indication that [Kaiser's l]icense was in danger of being suspended. In fact, that Notice led [her] to conclude that because the Board was already processing Mr. Meyer's . . . [a]pplication, there was nothing further to be done until additional requests were made by the Board . . . ."

---

[10]Howland took care of "all of the administrative paperwork." Meyer "would be informed of issues that [Howland] believed [he] needed to take care of, and that was about it." If something required his signature or, in Howland's view, otherwise required Meyer's attention, she submitted it to Meyer—but not otherwise. In his own words, Meyer is the Kaiser officer "who is most knowledgeable with respect to the status of the California contractors licenses held by [Kaiser and its parent company] for the relevant time period." More specifically, "[m]aintaining proper licensing status was a shared responsibility between myself as Vice President, Construction and the legal department of [Kaiser]. A clerk in the legal department was charged with the responsibility for maintaining the proper paperwork flow with the Board as well as with the licensing authorities of all of the other numerous states in which [Kaiser] did business. This paperwork consisted of applications for replacing qualified individuals, certificates of workers' compensation insurance, certifications regarding bonds, notices of current officers, and ancillary correspondence. The person who performed this function prior to and during the period of the Sepulveda project was [Howland]." Meyer is not a lawyer.

— On September 22, 1995, without notice to Kaiser, the Board suspended Kaiser's license.[11]

— On October 3, 1995, the Board sent a "Notice of Intent to Suspend License" to Kaiser, advising that its Certificate of Workers' Compensation Insurance had expired and had to be replaced by November 2. A new Certificate was obtained and forwarded to the Board on October 23. As Howland later explained, had there been any question in her mind about the status of Kaiser's license (and there was none), this notice would have confirmed her belief that there was no problem—since the Board would not have been threatening to suspend Kaiser's license over a workers' compensation insurance issue if the license was already suspended.

— On October 10, Meyer took and passed the examination. On the same day, the Board notified Kaiser that, by January 8, 1996, it had to submit a Q.I. bond for Meyer. On October 12, Howland asked Debbie Gomez (an employee in Kaiser's risk management department) to obtain the required Q.I. bond. On October 18, the Board notified Kaiser that the Q.I. bond was due January 16, 1996 (not January 8 as originally stated).

— On October 23, 1995, Gomez left a voice mail message for Shannon Keane, the vice-president of J&H Marsh & McLennan, Inc., Kaiser's insurance broker. In the message and in a follow-up fax, Gomez asked Keane to "provide a Bond of Qualifying Individual in the amount of $7,500 for Christopher B. Meyer," and to send it to Gomez "by the end of the week." On October 26, 1995, the Q.I. bond for Meyer was issued (by Kaiser's broker on behalf of the surety, United Pacific Insurance Company) and sent to Howland who, as the result of an apparent clerical oversight, failed to submit it to the Board.[12]

---

[11]Although the Board is not obligated by statute or regulation to notify a licensee when a license is suspended, it is its practice to do so, "as a courtesy." By way of example, in 1994, when the Board received notice from one of Kaiser's insurers that a required bond had been canceled, the Board sent a "Notice of License Suspension" to Kaiser on June 22, 1994, advising it that, by operation of law, its license had been suspended as of that date (but that the suspension would be lifted when Kaiser filed the appropriate bond). Apparently, it was also the Board's practice to give retroactive application to a new bond—the June 22 notice states: "To avoid a break in licensing time, an original qualifying individual bond or cash deposit with an effective date of June 22, 1994 must be received at the Board's Headquarters Office on or before September 20, 1994."

[12]According to Howland, her usual procedure was to notify Kaiser's risk management department when a bond was required. The risk management department would make the necessary arrangements with the insurance brokerage firm, which would issue the bond and send it to the risk management department, which in turn would forward it to Howland. She

— On October 30, 1995, Kaiser entered its contract with Sepulveda. At that time and "at all times during the performance of the Sepulveda project," Meyer "understood and believed" that Kaiser was "in compliance with the California licensing requirements . . . ." "As of the end of October, 1995, [he] firmly believed that [he] had satisfied all requirements for replacing Mr. Hergenrader and believed that [he] was validly acting as the RMO on the [Kaiser] license which [he] did not believe had ever been suspended during 1995."

— On December 22, 1995, the Board sent a notice to Kaiser stating that the change in qualifier would not be granted until all required documents

---

would then mail or deliver the bond to the relevant agency or board. "When bonds were forwarded to [Howland] for delivery to the Board, [her] normal practice was to forward them to the Board via Federal Express, or occasionally to hand-deliver them to the Board's offices in Sacramento." It was not until 1998 that she learned that Kaiser's contractor's license had been suspended by the Board from September 22, 1995, to February 15, 1996. "[She] was never previously aware of this suspension and believed at all times that [Kaiser's] license was in good standing . . . ." She knew that when Hergenrader left the company on June 24, 1995, he had to be replaced within 90 days. In her words: "I believed, however, that, if we properly filed the Application to Replace the Qualifying Individual within the ninety . . . day period, the new Qualifier passed the scheduled examination, and we complied with all other requirements within the periods indicated in notices received from the Board, our license would be effective even if the ninety . . . day period expired before all details, such as the filing of Q.I. Bonds, had been completed within the original ninety . . . day period." When she learned on October 10 that Meyer had passed the exam and that a Q.I. bond was required, she obtained a Q.I bond in the manner described in the text. Howland continues: "In the ordinary course of our handling of bonds, a Q.I. Bond would have been promptly sent to me by Debbie Gomez from our risk management office in Fairfax, Virginia, via pouch in our overnight mail. I then would have delivered the Q.I. Bond by hand or forwarded it by Federal Express to the Board. I have no present recollection of handling this Bond . . . in anything but my customary way, which was to promptly forward it to the Board via Federal Express for immediate filing. Generally, if there was any problem with any bond, the Board would promptly notify me, and I would promptly resolve the problem or would immediately pass the problem on to our risk management department for resolution." It was not until November 1998 that Howland learned the original Q.I. bond initially issued on October 26, 1995, had been found at the bottom of Kaiser's license file, "together with the original set of answers to Mr. Meyer's take home asbestos examination, which he gave to [her] shortly after October 10, 1995, to send to the Board." She continues: "I have no recollection of or explanation for why these documents are still in our file and why they were not sent to the Board in October, 1995. . . . It is a surprise to me that they were found in the files, and that this particular bond and the take home answers apparently were not submitted to the Board. I believed that I had forwarded this bond to the Board within a day or two of its issuance on October 26, 1995." A duplicate bond was submitted to the Board by Howland because (as the result of subsequent requests from the Board for documents pertaining to Kaiser's parent company) Howland thought there was a problem with the company's name on the original bond, a common situation—insurance and bonding companies would sometimes issue documents in the name of Kaiser's parent company, which sometimes was unacceptable to the Board and the paperwork would have to be redone.

were received, and that they were due by January 16, 1996. More specifically, the notice stated, "We will need a Rider for the Bond for an effective date." The notice explained that Kaiser would "be notified in writing as soon as the change in qualifying individual [was] granted." According to Howland and Meyer, Kaiser did not receive the December 22 notice, an assertion supported by the fact that, unlike all the other notices produced by Kaiser during discovery, the copies of the December 22 notice do not bear Kaiser's usual "received" stamp to show the date on which they were received in the company's legal department.

— A bond, showing the effective date of October 26, 1995, was issued by the original bonding company and submitted to the Board by Howland on February 12, 1996. As noted above, this was done because Howland thought there was a problem with the company's name, not because she was aware that the original had never been sent. (See fn. 12, *ante.*)

— On February 15, 1996, Kaiser's license was reinstated. On the same day, Kaiser was advised by the Board that Meyer had been approved as the replacement qualifier. Although it was customary for the Board to reinstate licenses retroactively to the effective date of late-submitted bonds, it did not do so in this instance.

— On May 10, 1996, the Board sent a letter to Kaiser noting the Board's September 20, 1995, receipt of a notice of Hergenrader's disassociation from Kaiser. The letter continues: "Due to some unfor[e]seen circumstance the computer was not not[ified] of the disassociation at that time. This error was discovered when we received another Notice of Disassociation from [Hergenrader] and our records have been corrected to reflect the first Notice of Disassociation. [¶] *Upon discovery of our error the ASB certification class was removed from the license effective 9-22-95.* [¶] *If you wish to have the ASB - Asbestos certification class added to the license you must complete the enclosed application and return it with the required fee.*" (Italics added.) As further explained in a declaration submitted by Everet Lawson, an Assistant Licensing Deputy with the Board, "It appears that the Notice of Disassociation [received by the Board on November 20, 1995] was not properly entered into the Board's computer system at the time that the Notice was received. [¶] . . . As a result[,] . . . the Board never sent a Notice of Suspension to . . . Kaiser . . . relating to the failure to replace its qualifier by September 22, 1995, *which otherwise would have been sent in the ordinary course. Further, the Board's records did not show a suspension for a lack of qualifier during the period from September 22, 1995 through May, 1996. . . .* [¶] . . . Because the disassociation date . . . was not entered into the computer

system until much later, the Board's employees at the call center and service desks would not have had notice of that disassociation date. *As a result, if a person were seeking current information about the status of the . . . Kaiser . . . license between September, 1995 and May, 1996, the employees at the Board's call center or any of the Board's service desks would likely have confirmed that [Kaiser's] contractor's license was in good standing.*" (Italics added.)

## E. *The Evidence Does Not Support the Trial Court's Findings*

Reduced to what matters, the evidence shows (1) that no one at Kaiser had a clue that its contractor's license had been suspended, (2) that the documents sent by the Board to Kaiser suggested, if anything, that there was nothing further to be done by Kaiser, (3) that the required bond was at all times in full force and effect so that, had a claim been made, the required coverage would have been available, (4) that the Board itself was (for all practical purposes) unaware of the suspension at the time of its occurrence, and (5) that, had anyone inquired of the Board about the status of Kaiser's license during the time of the suspension, the answer would have been that Kaiser was licensed as required by law. In the face of these facts and in the absence of any evidence to the contrary, we cannot say that the trial court's findings are supported by the evidence. (*Construction Financial* v. *Perlite Plastering Co., supra,* 53 Cal.App.4th at p. 179.)

Under the plain language of the relevant part of the statute, the trial court "may determine that there has been substantial compliance with licensure requirements . . . if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor . . . did not know or reasonably should not have known that he or she was not duly licensed. . . ." (§ 7031, subd. (d).) By presenting the evidence discussed above, Kaiser clearly met its burden of proof to show that it did not know, and reasonably should not have known, that it was not duly licensed at the times relevant to its contract with Sepulveda. (§ 7031, subd. (d).) Sepulveda did not present *any* evidence to rebut the showing made by Kaiser. Since our detailed discussion of the evidence before the trial court includes *all* of the evidence presented by both sides, not just that presented by Kaiser, we reject Sepulveda's arguments about what Kaiser should have known.

As noted at the outset, Sepulveda's arguments are premised on its mistaken belief that the issue is what Kaiser actually knew, not what it should have known. Implicit in that argument is the suggestion that information

discovered long after the dispute arose ought to somehow relate back and be imputed to Kaiser's employees during the period of suspension. Sepulveda offers no authority for such a rule and we know of none. The evidence is clear that, between them, Meyer and Howland thought they had done everything they were required to do. The Board, in turn, did everything possible to lead Meyer, Howland and everyone else at Kaiser who might arguably be responsible for the licensing process to believe that everything was in order. The fact remains that, although not required to do so, the Board *does* send out notices of suspension when they occur. No such notice was sent in this case. To the contrary, the communications that were issued by the Board to Kaiser led Kaiser to believe that everything was working its way through the system (e.g., "we are currently processing an application for Christopher Meyer to become the new qualifier on the license").

If the doctrine of substantial compliance included in section 7031 is to have any effect at all, it must be applied in this case. To conclude, as did the trial court, that Kaiser should have known its license was suspended when not even the Board knew about the suspension is to read subdivision (d) and the concept of statutory (not judicial) substantial compliance right out of the statute. That we will not do, particularly where, as here, there is no evidence to support the trial court's findings.[13]

## DISPOSITION

The petition is granted. Let a peremptory writ issue commanding the trial court to vacate its judgment and ancillary orders. The cause is remanded to the trial court for the resolution of such further issues as there may be concerning the confirmation of the arbitrators' award. Kaiser is awarded its costs of these writ proceedings.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied October 14, 1999, and the petition of real parties in interest for review by the Supreme Court was denied January 19, 2000.

---

[13]Insofar as we can determine from the record before us, the trial court did not decide any of the other issues raised in Sepulveda's petition to vacate the arbitrators' award. For this reason, we will not address any other issues, notwithstanding that they may have been briefed in these writ proceedings.