[No. B151002. Second Dist., Div. Four. Feb. 13, 2002.]

STEPHEN J. SMITH, as Director, etc., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and ALMA PISTON
COMPANY, Respondents.

[redacted]

**COUNSEL**

John M. Rea, Anthony Mischel and Christine L. Harwell for Petitioner.

Grancell, Lebovitz, Stander, Marx and Barnes, Norin T. Grancell and Lawrence Kirk for Respondent Alma Piston Company.

No appearance for Respondent Workers' Compensation Appeals Board.

**OPINION**

**CURRY, J.**—The Workers' Compensation Appeals Board (WCAB) determined that respondent Byung Hoon Yoon, doing business as Universal Painting Company (Universal), was a licensed contractor despite his failure to obtain workers' compensation insurance covering respondent Sung Mi Lee, and thus respondent Alma Piston Company, doing business as Tomadur Engine Company (Tomadur), which had hired Yoon, was not liable for workers' compensation benefits paid to Lee. Stephen J. Smith, Director of the Department of Industrial Relations, acting in his capacity as administrator of the Uninsured Employers Fund (UEF), filed a petition for writ of review of the WCAB's decision. We deny the petition.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

In May 1994, Yoon applied to the Contractors' State License Board (CSLB) for a painting contractor's license. Yoon's application indicated that he would do business as an individual and that he was the sole owner. In support of his application, Yoon submitted a declaration that he had no employees, and was thus exempt from the requirement under Business and

Professions Code section 7125[1] to secure a certificate of workers' compensation insurance. On May 13, 1995, Yoon was issued a license valid until May 31, 1997.

On September 13, 1996, Yoon doing business as Universal submitted a proposal for painting work to Tomadur. Yoon proposed to paint a building for $46,750. The proposal stated that "[p]rior to job commencement the owner will be provided with a certificate of insurance showing company coverage limits for both General Liability ($1 million) and Worker's [*sic*] Compensation Insurance."

On October 9, 1996, Tomadur entered into an agreement with Yoon doing business as Universal "in accordance with the terms set forth in [Yoon's] bid." The agreement stated: "Our workers are fully covered by Worker [*sic*] Compensation Insurance, and Universal Painting carries a One Million Dollar liability insurance policy."

Yoon employed Lee, and on November 4, 1996, Lee was seriously injured while painting Tomadur's building. Yoon did not respond to Lee's claim for workers' compensation benefits, and Lee applied to the WCAB for an adjudication of his claim. ▉▉▉▉ Tomadur was joined in the action, and the UEF[2] stipulated to advance benefits to Lee.

On March 8, 2001, the workers' compensation judge (WCJ) found that Yoon lacked a valid contractor's license when Lee sustained his injuries, that Yoon and Tomadur were Lee's joint employers on that date, and that they were jointly and severally liable for his injuries.

On March 12, 2001, Tomadur filed a petition for reconsideration. In the WCJ's report and recommendation on reconsideration, the WCJ explained that Yoon lacked workers' compensation insurance when he employed Lee, and that under the WCJ's understanding of sections 7125 and 7125.2, Yoon's license was suspended immediately upon his employment of workers. The WCJ concluded that Yoon lacked the valid license required for the

---

[1] All further statutory references are to the Business and Professions Code, unless otherwise indicated.

[2] "The [UEF] was created to ensure that workers employed by illegally uninsured employers are not deprived of workers' compensation benefits. (Lab. Code, § 3716, subd. (b).) Although the [UEF]'s obligation is, to a large extent, coextensive with that of the uninsured employer (Lab. Code, §§ 3715, 3716), once the [UEF] pays the entire award, the [UEF] becomes subrogated to the employee's claim and may proceed directly against the uninsured employer to recover the entire amount of the award from him. (Lab. Code, §§ 3717, 3719; *Flores* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 171, 178 [113 Cal.Rptr. 217, 520 P.2d 1033].) But should the employer prove to be insolvent, the [UEF] will bear the entire financial burden of the award. (*Id.* at p. 178.)" (*Rinaldi* v. *Workers' Comp. Appeals Bd.* (1988) 199 Cal.App.3d 217, 224-225 [244 Cal.Rptr. 637].)

status of independent contractor when Lee was injured, and thus Tomadur shared liability for Lee's injuries.

On May 8, 2001, the WCAB granted reconsideration and amended the WCJ's findings, concluding that Yoon had a valid license when Lee was injured, and that Yoon doing business as Universal was Lee's sole employer on that date. The WCAB reasoned that under subdivision (a) of section 7125.2, a contractor's license is suspended 30 days *after* the CSLB sends the contractor a notice concerning the lack of workers' compensation insurance, and that no such notice was sent to Yoon.

On June 21, 2001, petitioner filed a petition for writ of review on behalf of the UEF, challenging the WCAB's decision.

## DISCUSSION

Petitioner contends that the WCJ properly determined that under section 7125.2, subdivision (a), Yoon lacked a valid contractor's license when Lee was injured, and thus liability for Lee's injuries attached to Tomadur because Yoon was not an independent contractor.[3]

### A. *Independent Contractor Status*

Under the statutes governing workers' compensation, the overarching question concerning Tomadur's liability is whether Yoon was an independent contractor when Lee was injured. ▪ Generally, "absent any statute imposing liability, California courts have consistently held that an owner or general contractor is not liable under workers' compensation for injury to the employee of an independent contractor hired by the general contractor. [Citations.] On the other hand, if the person hired by an owner or general contractor is an employee rather than an independent contractor, the general contractor may be liable under workers' compensation for injuries to persons hired by the employee, on the theory that such persons are also the general contractor's employees." (*Blew v. Horner* (1986) 187 Cal.App.3d 1380, 1387 [232 Cal.Rptr. 660].) These principles apply when, as here, the question concerns the liability of an owner for injuries to the employee of an ostensible independent contractor hired by the owner. (See *Brietigam v. Industrial Acc. Com.* (1951) 37 Cal.2d 849, 852 [236 P.2d 582].)

Central to the determination of Yoon's status as an independent contractor for the purposes of workers' compensation liability is Labor Code section

---

[3]Petitioner has requested that we take judicial notice of records from other proceedings before the WCAB, and publications and other information now available from the CSLB. We hereby do so. (Evid. Code, §§ 452, 459.) Upon review, we have determined that nothing in these materials disturbs our conclusion, explained below, that the WCAB's decision was correct.

2750.5. (*Zellers v. Playa Pacifica, Ltd.* (1998) 61 Cal.App.4th 129, 132-133 [70 Cal.Rptr.2d 919].) The parties do not dispute that Tomadur hired Yoon for work requiring a contractor's license (Bus. & Prof. Code, § 7026). On this matter, Labor Code section 2750.5 provides that "any person performing any function or activity for which a [contractor's] license is required . . . *shall* hold a valid contractors' license as a condition of having independent contractor status." (Lab. Code, § 2750.5, subd. (c), italics added.)

The parties also do not dispute the WCAB's implied finding that, setting aside whether Yoon held a valid contractor's license, Yoon's dealings with Tomadur—including his autonomy and freedom from supervision—met the factual requirements for the status of an independent contractor while he carried out the work under his agreement with Tomadur (Lab. Code, § 2750.5, subd. (a)). ■ Thus, the crucial question under Labor Code section 2750.5 is whether Yoon held a valid contractor's license on the date that Lee was injured. (*Zellers v. Playa Pacifica, Ltd.*, *supra*, 61 Cal.App.4th at pp. 132-133.)

### B. *Section 7125.2, Subdivision (a)*

The resolution of this question hinges on the correct interpretation of section 7125.2, subdivision (a), which governs the suspension of licenses for failure to maintain workers' compensation insurance. ■ We review the WCAB's conclusions on this matter of statutory interpretation de novo. (See *Save Mart Stores v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.App.4th 720, 723 [4 Cal.Rptr.2d 597].) However, to the extent that our inquiry also requires an examination of the WCAB's factual determinations, we review these determinations for the existence of substantial evidence. (*Ibid.*)

■ "A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.]" (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387-388 [20 Cal.Rptr.2d 523, 853 P.2d 978].)

In examining the language of the statute, we must consider "the context of the statute . . . and the statutory scheme of which it is a part. 'We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." [Citations.]' [Citations.] ' "If possible, significance should be given to every word, phrase, sentence and

part of an act in pursuance of the legislative purpose." [Citation.] . . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' [Citations.]" (*DuBois v. Workers' Comp. Appeals Bd.*, *supra*, 5 Cal.4th at p. 388.)

Here, section 7125.2 makes express reference to sections 7125 and 7125.1, and thus they must be interpreted together. Subdivisions (a) and (d) of section 7125 establish licensing and reporting requirements regarding workers' compensation insurance. Subdivision (a) of section 7125 provides in pertinent part: "The [CSLB] shall require as a condition precedent to the issuance, reinstatement, reactivation, renewal, or continued maintenance of a license, that the applicant or licensee have on file a Certificate of Workers' Compensation Insurance or Certification of Self-Insurance. A Certificate of Workers' Compensation Insurance shall be issued and filed by one or more insurers duly licensed to write workers' compensation insurance in this state. A Certification of Self-Insurance shall be issued and filed by the Director of Industrial Relations." Subdivision (d) of section 7125 requires insurers to report the cancellation of a workers' compensation policy to the registrar[4] of the CSLB within 10 days of the cancellation.

Subdivision (b) of section 7125 carves out an exception to these requirements for contractors who do not employ workers. It provides: "This section does not apply to an applicant or licensee who has no employees provided that he or she files a statement with the [CSLB] on a form prescribed by the registrar that he or she does not employ any person in any manner so as to become subject to the workers' compensation laws of California. The filing of a false statement constitutes a cause for disciplinary action."

Section 7125.1 governs the reinstatement of licenses subject to the certificate requirement in subdivision (a) of section 7125. It requires the registrar to reinstate such a license "retroactive to the effective date of the certificate" when the certificate is received in a timely manner or other conditions (not relevant here) are met, provided that the license is "otherwise eligible . . . ." (§ 7125.1, subd. (a).)

The focus of the dispute before us is subdivision (a) of section 7125.2, which states: "The failure of a licensee required pursuant to this chapter to

---

[4] The registrar is the executive officer and secretary of the CSLB, and is charged with carrying out the administrative duties found in section 7000 et seq., as well as any duties delegated by the CSLB. (§ 7011.)

maintain workers' compensation insurance shall result in the automatic suspension of the license by operation of law. The registrar shall notify any licensee who fails to maintain workers' compensation that his or her license shall be automatically suspended 30 days from the date of the notice. Within 30 days of a suspension pursuant to this section, the registrar shall provide the licensee with an additional notice that informs the licensee of the suspension date, the cause for suspension, and reinstatement procedures. Reinstatement shall be made at any time following the suspension by showing proof of compliance as specified in Sections 7125 and 7125.1."

Emphasizing the first sentence of section 7125.2, subdivision (a), petitioner contends that Yoon's employment of workers, coupled with his lack of workers' compensation insurance as required by section 7125, resulted in the "automatic suspension of [his] license by operation of law." (§ 7125.2, subd. (a).) By contrast, the WCAB concluded that the final three sentences condition the suspension of licenses upon a notice from the CSLB, and thus that Yoon's license was not suspended because the CSLB never sent him the requisite notice.

C. *Suspension of License*

This question of statutory interpretation is one of first impression.[5] As we explain below, the proper interpretation of subdivision (a) of section 7125.2 is a difficult task, given the multiple and sometimes competing goals of California's statutes governing contractor licensing and workers' compensation. Although the question is close, we conclude that the WCAB has correctly interpreted and applied this subdivision under the circumstances of this case.

We begin by acknowledging that, read in isolation, the first sentence of section 7125.2, subdivision (a), supports the construction urged by petitioner. ▮ The phrase "operation of law," as ordinarily understood, "expresses the manner in which rights, and sometimes liabilities, devolve upon a person by the mere application to the particular transaction of the established rules of law, without the act or co-operation of the party himself." (Black's Law Dict. (6th ed. 1990) p. 1092, col. 1.) Thus, had subdivision (a) of section 1725.2 comprised this single sentence, the legislative intent would be clear: Yoon's license was suspended upon his employment of workers.

Nonetheless, the Legislature did not so limit subdivision (a) of section 1725.2. The second sentence requires the registrar to send a notice to *"any*

---

[5]The pattern of statutory language found in subdivision (a) of section 7125.2 reoccurs, with minor variations, several times elsewhere in the provisions of the Business and Professions Code governing contractors (e.g., §§ 7076.2, 7085.6, 7090.1). None of these provisions have been interpreted in any reported decision. Our inquiry here is limited to the issue presented by section 7125.2, subdivision (a).

licensee" not in compliance with the certification requirement that the pertinent license *"shall be* automatically suspended 30 days *from* the date of the notice" sent by the registrar. (§ 7125.2, subd. (a), italics added.) This sentence, by its plain language, applies to *all* noncompliant licensees, and it indicates that suspension automatically occurs 30 days *after* the notice is sent. To ignore this sentence and those that follow it is to render them "redundant and a nullity, thereby violating one of the most elementary principles of statutory construction. [Citations.]" (*Cal Pacific Collections, Inc. v. Powers* (1969) 70 Cal.2d 135, 139 [74 Cal.Rptr. 289, 449 P.2d 225].)

The language of section 7125.2, subdivision (a), thus provides support for two opposed interpretations. To resolve this conflict, we examine this subdivision in the context of the statutory schemes governing the licensing of contractors and workers' compensation insurance.

The schemes in question place special emphasis on *licensing* as an instrument for achieving their goals. To begin, sections 7125, 7125.1, and 7125.2 state a small portion of California's complex requirements concerning contractor's licenses found in the Business and Professions Code (§ 7000 et seq.). ■ The purpose of these requirements "is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.]" (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 [277 Cal.Rptr. 517, 803 P.2d 370].)

The CSLB is authorized to administer these requirements (§ 7010), and to enforce them through disciplinary action, including the suspension of licenses (§ 7090). By statute and regulation, the CSLB is required to provide certain information to the public concerning licensees and disciplinary action, if any, taken against them. (§ 7124.6; Cal. Code Regs., tit. 16, § 863 ["The Registrar shall establish a system whereby members of the public may obtain from board records information regarding complaints made against licensed contractors, their history of legal actions taken by the board, and license status, as hereafter specified."].)

To supplement the CSLB's efforts to ensure compliance with the licensing requirements, section 7031 bars unlicensed contractors from bringing a lawsuit to recover compensation for services unless "there has been substantial compliance with licensure requirements" (§ 7031, subd. (e)). Here, "[t]he obvious statutory intent is to discourage persons who have failed to comply

with the licensing law from offering or providing their unlicensed services for pay." (*Hydrotech Systems, Ltd. v. Oasis Waterpark, supra,* 52 Cal.3d at p. 995.)

The Legislature has also harnessed the licensing requirements in the Business and Professions Code to serve the statutory goals of the workers' compensation system. As we have noted (see pt. A., *ante*), Labor Code section 2750.5 renders a party who hires a contractor liable for workers' compensation when the contractor lacks a valid license. The Legislature's intent regarding this aspect of Labor Code section 2750.5 was explained in *State Compensation Ins. Fund v. Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5 [219 Cal.Rptr. 13, 706 P.2d 1146]. Noting that licensed contractors, unlike unlicensed contractors, were likely to obtain workers' compensation coverage, our Supreme Court stated: "While it may seem anomalous to hold that the hirer is liable for compensation only if the contractor lacks the required license, and that he would not be liable if the contractor were licensed, the justification is apparent in that the Legislature has sought to assure that both licensed and unlicensed contractors and their employees will have compensation should they be injured on the job." (*Id.* at p. 13.)

The pertinent provisions of Labor Code section 2750.5 also serve several related goals. Labor Code section 2750.5 places responsibility for the payment of unemployment fund contributions and various taxes on hirers of unlicensed contractors. (*Hunt Building Corp. v. Bernick* (2000) 79 Cal.App.4th 213, 218-220 [93 Cal.Rptr.2d 883].) The legislative history of Labor Code section 2750.5 indicates that it was intended to "help end the 'subterranean economy' where contractors hire unlicensed subcontractors and pay them in cash, resulting in the 'loss of large sums in taxes, employee social insurance contributions, and employee pension funds.' " (79 Cal.App.4th at p. 222, quoting Assem. Com. on Labor, Employment & Consumer Affairs, Analysis of Assem. Bill No. 3249 (1977-1978 Reg. Sess.) p. 1.)

Licensing thus serves two different sets of statutory goals. First, licensing *protects* those who hire contractors. To facilitate this protection, the Legislature has authorized the CSLB to provide the public with information about the current licensing status and disciplinary history of contractors. Second, the absence of a valid license *places liability* for workers' compensation coverage and related employer taxes and contributions on those who hire contractors.

The interpretation of section 7125.2 marks a point of tension between these statutory goals. The construction adopted by the WCAB enhances the

protective value of information about contractors available through the CSLB by tying suspension of an exempt contractor's license to a notice from the CSLB. By contrast, petitioner's construction would assure workers' compensation coverage for injuries to the employees of ostensibly exempt contractors, but reduce the protective value of information from the CSLB: the hirer of the exempt contractor would become liable for workers' compensation coverage when the contractor retained employees, regardless of whether the CSLB had issued a notice regarding this conduct.

In our view, the Legislature's determination concerning the proper balance between these goals with respect to section 7125.2, subdivision (a), is found in section 7030. Section 7030 requires that a contractor serving as a "prime contractor" must include in all written contracts a term stating that the CSLB is authorized to investigate complaints about the contractor, and that "any questions" about the contractor "may be referred" to the CSLB (§ 7030, subd. (a)). Furthermore, when the contractor is engaged to work on residential property with four or fewer units, section 7030 requires the contractor to issue a notice to the hirer before entering into a contract (§ 7030, subd. (b)).

The requisite notice must use capital letters and state in pertinent part: "LICENSED CONTRACTORS ARE REGULATED BY LAWS DESIGNED TO PROTECT THE PUBLIC. . . . YOUR ONLY REMEDY AGAINST AN UNLICENSED CONTRACTOR MAY BE IN CIVIL COURT, AND YOU MAY BE LIABLE FOR DAMAGES ARISING OUT OF ANY INJURIES TO THE CONTRACTOR OR HIS OR HER EMPLOYEES. [¶] YOU MAY CONTACT THE [CSLB] TO FIND OUT IF THIS CONTRACTOR HAS A VALID LICENSE. THE [CSLB] HAS COMPLETE INFORMATION ON THE HISTORY OF LICENSED CONTRACTORS, INCLUDING ANY POSSIBLE SUSPENSIONS, REVOCATIONS, JUDGMENTS, AND CITATIONS." (§ 7030, subd. (b).)

Section 7030 thus requires a contractor to inform a defined class of hirers that the contractor's lack of a license may impose liability on the hirer, that the hirer may contact the CSLB to determine whether the contractor has a valid license, and that the CSLB has "complete information" on "possible suspensions."[6] This requirement makes little sense unless the Legislature intended that the information available through the CSLB should generally permit hirers in the defined class to determine whether a contractor has a valid license, and thereby avoid liability for injuries to the contractor's

---

[6]The Legislature amended section 7030 in 1996. (Stats. 1996, ch. 282, § 2, eff. Jan. 1, 1997.) However, the provisions cited in the text are found in both the current version of section 7030 and the version operative when Tomadur hired Yoon, and Lee was injured.

employees. Otherwise, section 7030 would mandate that contractors must provide misleading notices.

Although this notice requirement applies only to a limited class of hirers, it indicates a legislative preference that the information available from the CSLB should be sufficient in the usual or typical case to enable *any* hirer to avoid liability for injury to the contractor's employees. For the reasons described above (see pt. A., *ante*), the imposition of liability on the hirer of a contractor under Labor Code section 2750.5 does not hinge on whether the hirer falls within the class defined in Business and Professions Code section 7030, but on whether the contractor has a valid license. In our view, the legislative preference evinced in Business and Professions Code section 7030 supports the conclusion that Business and Professions Code section 7125.2, subdivision (a), conditions suspension of a license upon the issuance of the requisite notice.

Here, the WCAB determined that no such notice issued, and that the CSLB was unaware of Yoon's violation of his status as an exempt licensee. The record supports these determinations, and also indicates that the information available to Tomadur from the CSLB and other sources would not have placed Tomadur on notice that Yoon was licensed as an exempt contractor or that he had violated the conditions of his status. Yoon's proposal and agreement with Tomadur recited that Yoon (doing business as Universal) was licensed and insured. The record also discloses that during the pertinent time, the CSLB answered routine inquiries about Yoon by stating that Yoon was licensed, without disclosing that Yoon was an exempt licensee.[7]

For this reason, nothing in the record reasonably supports the conclusion that Tomadur knew, or should have known, that Yoon had violated the conditions of his license in employing Lee. Although the agreement between Yoon and Tomadur obliged Yoon to provide Tomadur with a copy of his insurance policy and Yoon presumably did not provide this proof of insurance, had Tomadur sought information from the CSLB about the status of Yoon's license, it would have been informed simply that Yoon was then licensed as a contractor. Accordingly, the WCAB correctly determined that Tomadur had no liability for Lee's injuries under the workers' compensation scheme.

---

[7]The sole evidence in the record bearing on the CSLB's treatment of routine inquiries regarding Yoon's license during the pertinent period is as follows: In August 1997, Tomadur's counsel requested information concerning Yoon's license. The CSLB responded with a verified certificate, which CSLB represented as providing "a history of the contractors license." The verified certificate stated that Yoon held a contactor's license, but not that he was an exempt licensee.

Petitioner disagrees on several grounds. To begin, petitioner contends that, as a factual matter, Tomadur knew that Yoon was illegally uninsured when it accepted Yoon's proposal. However, the record does not reasonably support this contention.

After setting forth the terms of Yoon's offer, Yoon's proposal states: "It is important to know that if an employer does not pay payroll taxes for all personnel, those persons are not protected by workers compensation benefits and, thus become your 'responsibility' in the event of an accident. [¶] The combined costs of payroll taxes and worker's [sic] compensation insurance amount to approximately 25% of the job cost. Unfortunately, avoiding these costs becomes an attractive temptation for those willing to 'Cut corners'. Auditing payroll records for all personnel utilized on-site is the only available method to ensure complained [sic]." The proposal also indicates that Yoon revised his original bid for Tomadur's work from $46,750 to $41,750, but does not explain the basis for this revision.

Petitioner suggests that the statements in Yoon's proposal, coupled with Yoon's revision of his bid, raises the inference that Tomadur knew or understood that Yoon had reduced his costs by failing to obtain workers' compensation coverage. We disagree. The statements in Yoon's proposal, on their face, are a generic warning about owner responsibilities and the dangers of accepting unusually low bids. Moreover, there is no evidence that Yoon's revised bid was unusually low. Accordingly, the statements in the proposal do not support the inference that Tomadur knew that Yoon had illegally avoided the costs of workers' compensation insurance. Finally, because there is no evidence that Yoon had workers' compensation coverage before he revised his bid, it is pure speculation that this revision reflected an understanding between Yoon and Tomadur that Yoon would reduce his bid by foregoing the costs of workers' compensation insurance.

Petitioner also contends that the WCAB's interpretation of section 7125.2 is incorrect for several reasons. First, citing *ICF Kaiser Engineers, Inc. v. Superior Court* (1999) 75 Cal.App.4th 226 [89 Cal.Rptr.2d 88], *Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374 [70 Cal.Rptr.2d 427], *Rushing v. Powell* (1976) 61 Cal.App.3d 597 [130 Cal.Rptr. 110], and *Shields v. Shoaff* (1953) 116 Cal.App.2d 306 [253 P.2d 1002], petitioner argues that the concept of an automatic suspension by operation of law, by its nature, implies that any such suspension would occur independent of action by the CSLB.

We agree that the phrase "operation of law," taken in isolation, carries the meaning that petitioner proposes. Nonetheless, we must construe subdivision

(a) of section 7125.2 in its entirety, and in the context of the pertinent statutory schemes. (*DuBois v. Workers' Comp. Appeals Bd.*, *supra*, 5 Cal.4th at p. 388.) For this reason, the phrase "operation of law," by itself, does not dictate the correct interpretation of this subdivision. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

The cases cited by petitioner provide no guidance on the issue before us. In these cases, the courts addressed current section 7068.2 or its predecessors, all of which provide (with some variation in language) that when a business holds a license by virtue of a "responsible managing employee" (RME), the license is automatically or "ipso facto" suspended unless the business notifies the CSLB in a timely manner that the RME has been disassociated. (*ICF Kaiser Engineers, Inc. v. Superior Court*, *supra*, 75 Cal.App.4th at pp. 230-231; *Buzgheia v. Leasco Sierra Grove*, *supra*, 60 Cal.App.4th at pp. 380-381; *Rushing v. Powell*, *supra*, 61 Cal.App.3d at pp. 606-607 & fn. 12; *Shields v. Shoaff*, *supra*, 116 Cal.App.2d at p. 308.)

The versions of section 7068.2 addressed in those cases lack any language resembling the final three sentences of section 7125.2, subdivision (a). Moreover, each case cited by petitioner concerns the interaction of section 7068.2 (or its predecessors) with section 7031, which generally denies unlicensed contractors access to the courts to recover compensation for their services. (*ICF Kaiser Engineers, Inc. v. Superior Court*, *supra*, 75 Cal.App.4th at pp. 231-235; *Buzgheia v. Leasco Sierra Grove*, *supra*, 60 Cal.App.4th at p. 380; *Rushing v. Powell*, *supra*, 61 Cal.App.3d at p. 605; *Shields v. Shoaff*, *supra*, 116 Cal.App.2d at pp. 306-308.) As we have explained, section 7031 supplements the CSLB's efforts to enforce licensing requirements, and thus it serves a legislative goal not at issue here. Accordingly, the cases cited by petitioner are not pertinent to the question before us.

We recognize that in enacting section 7068.2, the Legislature may have determined that in some situations, liability for workers' compensation is properly imposed on hirers due to an automatic suspension through the operation of this section, even though inquiries to the CSLB would not have disclosed the suspension. We do not address or decide that question here. However, assuming that the Legislature enacted section 7068.2 with this intent, our conclusion regarding subdivision (a) of section 7125.2 is undisturbed. Unlike section 7068.2, sections 7125, 7125.1, and 7125.2 directly address a matter concerning liability for worker injury, a key subject of the notices mandated under section 7030, and subdivision (a) of section 7125.2 expressly ties suspensions to the issuance of notices. Furthermore, in enacting subdivision (a) of section 7125.2, the Legislature also enacted a version

of section 7030 whose language materially resembles the now-effective section 7030. (Stats. 1995, ch. 467, §§ 1.5, 14-20.) Accordingly, the legislative intent concerning subdivision (a) of section 7125.2 appears to be clear.

Second, petitioner suggests that an automatic suspension under section 7125.2, subdivision (a), must be construed as independent of any notice from the CSLB, citing subdivision (a) of section 7125, which provides that workers' compensation insurance is "a condition precedent to the . . . continued maintenance of a license" when the licensee has no employees. However, subdivision (a) of section 7125, by its plain language, is directed in the first instance at the CSLB, and not the licensees: it states that *the CSLB* "shall require" workers' compensation as a condition precedent for a license. So understood, subdivision (a) of section 7125 provides the rationale for the notice provisions in section 7125.2, subdivision (a), and it therefore comports with our conclusion concerning the latter subdivision.

Third, petitioner contends that subdivision (a) of section 7125.2, viewed in the context of the workers' compensation system, must be regarded as imposing an automatic suspension as soon as an ostensibly exempt contractor hires employees. Petitioner argues that unless an automatic suspension occurs at that time, the contractor's employees will not receive workers' compensation coverage through the owner that hired the contractor, thereby defeating the statutory goal of wide coverage.

Again, we are not persuaded. We recognize that the workers' compensation scheme should be construed, whenever possible, in favor of coverage (*Pacific Gas & Elec. Co. v. Ind. Acc. Com.* (1961) 56 Cal.2d 219, 223 [14 Cal.Rptr. 548, 363 P.2d 596]). However, as we have explained, the question before us involves a conflict between the goals of the workers' compensation system and the licensing requirements in the Business and Professions Code, and the Legislature has resolved this conflict in favor of protecting those who hire contractors.

Finally, noting that the statutes in question do not establish a mechanism that alerts the CSLB when exempt contractors hire employees, petitioner contends that the WCAB's interpretation, unlike that offered by petitioner, renders the pertinent statutes defective. Petitioner argues that under the WCAB's interpretation, the CSLB will frequently fail to issue the requisite suspension notices, and thus exempt licensees will be free to violate the conditions of their licenses. By contrast, under petitioner's interpretation, hirers are encouraged to monitor their contractors through the imposition of

liability for workers' compensation coverage. Petitioner suggests that the Legislature intended to enact such a system of hirer supervision, citing excerpts from the legislative history of the pertinent provisions.

█ We recognize that we should avoid statutory constructions that would produce absurd consequences. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 578 [110 Cal.Rptr.2d 809, 28 P.3d 860].) However, we have " 'no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' [Citations.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

█ Here, nothing before us reasonably indicates that the Legislature intended to implement a system of hirer supervision. We agree that sections 7125, 7125.1, and 7125.2 do not provide the CSLB with any systematic means of detecting exempt licensees who hire employees. However, for the reasons explained above, the language of section 7125.2, subdivision (a), does not disclose an intent to deter noncompliance by imposing liability for workers' compensation coverage on hirers. Furthermore, nothing in the history provided by petitioner demonstrates the existence of any such intent.[8] On the contrary, the record suggests that the although the Legislature recognized the potential problems created by the CSLB's inability to detect noncompliance by exempt licensees, it did not respond to these problems by creating a system of hirer supervision.

The legislative history indicates that the pertinent provisions were enacted to "require the maintenance of workers' compensation insurance as a condition of licensure and . . . make the failure to maintain this coverage grounds for *disciplinary action*." (Assem. Com. on Governmental Efficiency and Consumer Protection, Rep. on Assem. Bill No. 2282 (1989-1990 Reg. Sess.) Apr. 12, 1989, p. 1, italics added.) Regarding the exemption for contractors without employees, the history discloses that members of the Legislature expressed concerns about the CSLB's enforcement of this exemption.

A Senate committee analysis contains the following statements under the caption "Possible amendments": "The bill contains an 'honor system' self-exemption relating to the maintenance of workers' compensation insurance.

---

[8]The legislative history that petitioner has submitted concerns the enactment of former section 7109.2, the predecessor of section 7125.2, subdivision (a). Former section 7109.2 was repealed and replaced with section 7125.2, subdivision (a), which contains similar, but not identical, language. (Stats. 1995, ch. 467, §§ 14-20.) However, the differences between section 7125.2, subdivision (a), and its predecessor are immaterial to our discussion below.

The exemption allows a contractor to file a statement with the CSLB signed under penalty of perjury that they are not subject to workers' compensation laws. Should the CSLB verify these self-exemption filings or at least investigate the validity of the exemption claim?" (Sen. Com. on Business and Professions, Rep. on Assem. Bill No. 2282 (1989-1990 Reg. Sess.) May 21, 1990, p. 1.)

Nonetheless, the pertinent provisions, as enacted, do not reflect any such amendments. Furthermore, nothing in the legislative history suggests that the Legislature decided to supplement the CSLB's enforcement efforts with a system of hirer supervision.

Rather, an examination of the existing statutory scheme discloses an alternative resolution of these concerns. Under section 7083, exempt contractors are required to inform the registrar within 90 days of material changes to information recorded under chapter 9, division 3 of the Business and Professions Code, which encompasses section 7125. As we have noted, the CSLB is authorized to discipline licensees who violate the requirements of their licenses (§ 7090). Finally, section 7126 provides that any licensee who violates the provisions of section 7125, 7125.1, or 7125.2 is guilty of a misdemeanor. In light of these provisions, it appears that the Legislature determined that the threat of disciplinary action and criminal penalties would significantly deter exempt contractors from hiring employees, and thus it was unnecessary to provide the CSLB with a systematic means of detecting such conduct.

Petitioner disagrees with this assessment of the effectiveness of these threats,[9] and argues that it would be wise policy to require that hirers ensure their exempt contractors meet the conditions of their licenses. Petitioner may be correct, and the Legislature may wish to revisit this matter. ■ Nonetheless, "[w]hen the Legislature has spoken, the court is not free to substitute its judgment as to the better policy. We are obliged to carry out the intent of the Legislature if it can be ascertained." (*City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 121 [48 Cal.Rptr.2d 42, 906 P.2d 1196].) It is thus the Legislature's exclusive prerogative to remedy deficiencies in the existing statutory scheme. (See *Blew v. Horner, supra,* 187 Cal.App.3d at p. 1390, fn. 5.)

In sum, the WCAB correctly determined that Tomadur is not liable for Lee's injuries under the workers' compensation scheme.

---

[9]On this matter, petitioner notes that the CSLB, though apprised of Yoon's employment of workers, has renewed his license and has sent him only a disciplinary letter.

## Disposition

The petition for writ of review is denied. Respondent Alma Piston Company, doing business as Tomadur Engine Company, is awarded its costs.

Epstein, Acting P. J., and Hastings, J., concurred.