[L. A. No. 7197. In Bank.—November 22, 1922.]

PRESS PUBLISHING COMPANY (a Corporation) et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, etc., et al., Respondents.

[L. A. No. 7198. In Bank.—November 22, 1922.]

GENERAL ACCIDENT, FIRE AND LIFE ASSURANCE CORPORATION, etc., Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, etc., et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT—CONTRACT OF HIRE—CONSTRUCTION OF TERM.—A "contract of hire" as used in section 8 (a) of the Workmen's Compensation Act (Stats. 1917, p. 831) defining an employee means a contract for personal services as is indicated by the fact that the basis of compensation provided by the act is the amount of wages earned.

[2] ID. — INJURY FROM OVERTURNING OF MOTORCYCLE — CARRYING OF CREAM—DELIVERY OF NEWSPAPERS—STATUS OF CARRIER.—In this proceeding to have annulled an award of compensation for injuries received from the overturning of a motorcycle while carrying cream for a creamery and delivering newspapers for a publishing company along the same route, the surrounding circumstances of the employment as shown by the undisputed evidence warrant the inference that the claimant was under a contract for personal services to the creamery and likewise under a contract for personal services to the publishing company, it appearing that he was paid fixed wages and was subject to discharge at any time for unsatisfactory service.

[3] EMPLOYER AND EMPLOYEE—RELATIONSHIP—EVIDENCE—POWER OF TERMINATION.—The power of the employer to terminate the em-

———

1. Who are independent contractors, subcontractors, and their employees within the meaning of the Workmen's Compensation Acts, notes, 17 A. L. R. 621; L. R. A. 1916A, 23; L. R. A. 1918F, 201.

ployment at any time is incompatible with the full control of the work usually enjoyed by an independent contractor, and is a strong circumstance tending to show the subserviency of the employee.

[4] Id.—Power of Control — Inference from Circumstances.—In the absence of any express terms affirming or negating the power of control and direction, its existence must be determined from the reasonable inferences to be drawn from all of the circumstances surrounding and attending the making and execution of the contract considered in conjunction with the nature of· the contract and the duties ordinarily to be performed thereunder.

[5] Id.—Determining Factor—Right of Control.—It is not the actual exercise of control, but the right of control, which is important in a determination of whether or not the status of an employee or independent contractor exists, and one of the means of ascertaining whether or not this right of control exists is the determination of whether or not, if instructions were given, they would have to be obeyed.

[6] Id.—Delivery of Cream and Newspapers—Performance of Small Services for Patrons—Status of Employee Unaffected.—One carrying cream for a creamery and delivering newspapers for a publishing company along the same route was not engaged in the conduct of a transfer business and therefore in pursuit of an independent calling, by reason of the fact that he carried packages and filled small orders for persons along his route, where previous to the delivering of the cream and papers he did not own a motorcycle and was not engaged in any kind of transfer service, and the carrying of the packages was merely incidental to his main employment and the amount received therefor trivial in comparison with his regular wages.

[7] Id.—Delivery of Newspapers—Use of Roads—Where either of two roads was a reasonable one for the delivery of newspapers and no instructions were given as to which road should be used, the carrier was equally in the course of his employment when upon either road.

PROCEEDING in Certiorari to review an award of the Industrial Accident Commission.    Award affirmed.

The facts are stated in the opinion of the court.

George H. Moore for Petitioners Press Publishing Company and Employers' Liability Assurance Corporation.

Joe Crider, Jr., for Petitioner General Accident, Fire and Assurance Corporation.

A. E. Graupner and Warren H. Pillsbury for Respondents.

LENNON, J.—This is a proceeding by petitioners, General Accident & Fire Assurance Company, insurer of Lucia K. Hicks, owner of a creamery in Santa Barbara, and the Press Publishing Company, a newspaper published in that city, and its insurer, Employers' Liability Assurance Corporation, Limited, of London, England, to have annulled the award made by the Industrial Accident Commission to Leon Benefiel for injuries found by the commission to have arisen out of and in the course of his joint employment by said Lucia K. Hicks and the Press Publishing Company. The liability for compensation was apportioned according to the ratio which the wages Benefiel received from each employer bore to the sum total of the wages he received from both. On behalf of General Accident & Fire Assurance Company, insurer of Lucia K. Hicks, it is contended that Benefiel was, at the time of the injury for which compensation was awarded, not an employee of Lucia K. Hicks, but an independent contractor, and that therefore, Lucia K. Hicks was not liable for compensation for injuries received by him. On behalf of the Employers' Liability Assurance Company, insurer of the Press Publishing Company, it is contended that Leon Benefiel was at the time of injury an independent contractor and not an employee of the said company, and, furthermore, that even though it be found that he was an employee, nevertheless the Press Publishing Company was not liable for compensation, for the reason that at the time of the accident said employee was acting outside the sphere of his employment for the Press Publishing Company and the injury was not, as found by the commission, "in the course of" his employment. The facts upon which the commission made its findings and based its award, briefly stated, are these:

Benefiel, a minor, was employed for some time by Miss Lucia K. Hicks, at Santa Barbara, washing milk cans and doing similar work around her creamery. During this time a portion of her milk and cream was secured from the Dabney ranch at Los Olivos, about sixty miles northwest of Santa Barbara, and, owing to the strenuousness of the trip, she was having constant difficulty in getting anyone to

make the trip daily for the wages she was able to pay. One of the newspaper routes of the Press Publishing Company of Santa Barbara paralleled the route to be taken to the Dabney ranch for the cream, and Benefiel made an arrangement with Miss Hicks that he should endeavor to obtain the job of delivering the papers along this route and by combining the work of going after the cream and delivering the papers make sufficient money to compensate him adequately for the work. It was also expected that from occasional errands which he could perform for parties along the route, as delivering packages or filling small orders, he would earn enough to pay for the gasoline and oil for his motorcycle to be used in the work. A satisfactory arrangement was consummated with the Press Publishing Company whereby he was to deliver papers, some in bulk and some single copies, between Santa Barbara and the Dabney ranch, and Benefiel thereupon purchased a motorcycle with a side car attachment and commenced his joint duties.

Benefiel's work for Miss Hicks consisted in carrying ice and empty cream cans daily from Santa Barbara to Los Olivos and bringing back the cream from the farm there. For this work he was paid six dollars a day, regardless of the amount of cream carried and regardless of whether he used his own motorcycle or used Miss Hicks' automobile. If, however, he used her automobile the arrangement was that she was to receive the money he earned on the trip by performing the incidental errands. Benefiel's work was always satisfactory and Miss Hicks gave him no directions as to the time he was supposed to leave or the route he was to take, except that it was understood that he should have the cream back from the Dabney ranch to the dairy by 3:30 or 4 o'clock in the afternoon in time for the bottling.

The duties of Benefiel for the Press Publishing Company consisted of his calling for the papers at their office early in the morning and delivering them along the route. Every morning before leaving he was supposed to look for slips upon which were written instructions from the Press Publishing Company as to the names of new subscribers and those dropped from the subscription list. For this service he was paid a flat rate of fifteen dollars a week and was paid at the same time and in the same manner as the carriers

engaged upon each of the other routes of the Press Publishing Company. No directions were given him as to the time he was supposed to start nor as to the road he should take in reaching the commencement of the route. He was, however, supposed to start sufficiently early in the morning to have the last papers delivered at Los Olivos by 12 o'clock noon. While there seems to have been no complaint of his services by the Press Publishing Company, he was subject to being discharged by it at any time that his services should prove unsatisfactory.

There are two roads going out of Santa Barbara which he could use, both of which unite outside of the city and join the state highway. The Hollister road is better paved from the newspaper office to the state highway than is the Modoc road, which is, however, a little shorter and closer to Benefiel's home and the dairy. As he had no duties to perform until after the junction point of the two roads with the state highway, he was equally starting upon his route when using either of the two roads. Owing to the rattling of the milk cans in the empty side car, it was his practice to go to the dairy the night before and bring the empty cans to his home. The next morning he would go to the ice plant and procure the ice for icing the milk and get his bundles of papers from the office, then stopping at home he would load on the empty milk cans and leave by the Modoc road on his daily trip.

On the morning of February 11th, Benefiel, after getting the ice and papers and stopping at his home for the empty milk cans, started out the Modoc road from home as usual. While proceeding along that road at a point shortly before its intersection with the Hollister road, his motorcycle overturned in passing an automobile, and he was very seriously injured. At the time of the injury he was carrying in his side car the empty milk cans and ice for the creamery, the papers of the Press Publishing Company and a storage battery for a garage along his route. An application for adjustment of claim was filed by Benefiel with the Industrial Accident Commission against Miss Lucia K. Hicks and her insurance carrier, the General Accident, Fire and Life Assurance Corporation, and the Press Publishing Company, and its insurance carrier, the Employers' Liability Assurance Corporation. The Industrial Accident Commission

awarded compensation against both insurance companies, dismissing the employers because of their insurance. The separate writs of the two insurance companies having been consolidated for briefing and the facts upon which the award was made being practically the same, both cases will be considered and decided in this opinion.

[1]    An employee is defined by section 8 (a) of the Workmen's Compensation Act (Stats. 1917, c. 586, p. 831) to be "Every person in the service of an employer as defined by section 7 hereof under any appointment or contract of hire or apprenticeship, express or implied, oral or written." A "contract of hire" means a contract for personal services, as is indicated by the fact that the basis of compensation provided by the act is the amount of wages earned. (*Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807, 810 [159 Pac. 721].) [2]    That Benefiel was under a contract for personal services to Lucia K. Hicks to carry ice and empty milk cans daily from Santa Barbara to Los Olivos and bring back the cream from the farm there, and likewise under a contract for personal services to the Press Publishing Company for the delivery of the "Morning Press" on route 19 between Santa Barbara and Los Olivos is, in our opinion, a fair inference from the surrounding circumstances of his employment as is shown by the undisputed evidence. As to his arrangement with Miss Hicks, the fact that Benefiel was previously employed by her rendering personal services in and around the creamery, the fact that the work to be performed was not a particular transaction but contemplated a continuity of service, the fact that his payment was not a specified recompense for a specified result but was proportionate to the amount of labor involved rather than for the amount of cream carried, all support the inference that Benefiel was an employee rather than an independent contractor. There is no direct proof of any actual control exercised over Benefiel in the performance of his duties. It is an admitted fact, however, that he was required to have the cream at the creamery in Santa Barbara by 3:30 or 4 o'clock in time for bottling. It is also an admitted fact that Miss Hicks had the power to discharge him at any time his services should prove unsatisfactory, and this undoubtedly gave her the potential power of control. [3]    This power of the employer to terminate the employ-

ment at any time is a strong circumstance tending to show the subserviency of the employee, since it is incompatible with the full control of the work usually enjoyed by an independent contractor. Perhaps no single circumstance is more conclusive to show the relationship of an employee than the right of the employer to end the service whenever he sees fit to do so. (14 Ruling Case Law, p. 72.) Moreover, the fact that Miss Hicks had agreed that, in case Benefiel was unable to use his motorcycle, she would furnish him with an automobile to make the trip indicates that it was his personal services for which she contracted.

As to the services rendered for the Press Publishing Company, they were of an essentially personal nature. It was understood that the services were to be rendered by Benefiel himself. The Press Publishing Company retained control of its route and hired carriers to deliver its papers, and Benefiel was hired on the same terms, treated in the same manner and paid in the same way as the other carriers. It is not contended by the Press Publishing Company that Benefiel bought the papers himself and resold them or that he could have sublet the route. It is insisted, however, that there was no power of direction or control over Benefiel by the Press Publishing Company, which power was essential to establish the status of Benefiel as an employee. The existence or nonexistence of this power of direction and control cannot be determined from the terms of the contract, since nothing is expressly said therein as to this right. [4] In the absence of any express terms affirming or negating the power of control and direction, its existence must be determined from the reasonable inferences to be drawn from all of the circumstances surrounding and attending the making and execution of the contract considered in conjunction with the nature of the contract and the duties ordinarily to be performed thereunder. The circumstances attending the hiring of Benefiel warrant the inference that he was subject to the direction and control of the Press Publishing Company in the performance of his work. The most significant fact in this regard and one which points towards the relation of employee rather than to the status of an independent contractor is the fact that Benefiel was hired on the same terms as the other carriers and the Press Publishing Company had the right to exercise the same

direction and control over Benefiel as it did over the other carrier boys, concededly employees. While it is true that Benefiel was "on his own time" as to the time of starting, nevertheless his work was required to be finished at Los Olivos by 12 o'clock noon. He was also required to look each morning at the Press Publishing Company's office for slips concerning the addition of new subscribers or the discontinuance of old ones. If any complaints were made by patrons he would be required to note and remedy the defective delivery. **[5]** As previously indicated, it is not the actual exercise of control but the right of control—that is to say, the potential power of control—which is important in a determination of whether or not the status of an employee or independent contractor exists. (*Claremont Country Club* v. *Industrial Accident Commission*, 174 Cal. 395 [L. R. A. 1918F, 177, 163 Pac. 209].) One of the means of ascertaining whether or not this right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed. In the instant case, it is undisputed that the Press Publishing Company had the power to hire and the power to discharge its carriers for unsatisfactory service, and in this regard Benefiel was in no better position than the other carriers. This power of discharge made obligatory any instructions given, for it gave to the Press Publishing Company the power to require obedience to those instructions and insured their being carried out. As was held in *Western Metal Supply Co.* v. *Pillsbury*, 172 Cal. 407, 417 [Ann. Cas. 1917E, 390, 156 Pac. 591, 595], "The real test by which to determine whether a person is acting as the servant of another is to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control and was liable to be discharged for disobedience or misconduct." The fact that Benefiel furnished his own transportation does not, of course, affect his status as an employee. (*Eng-Skell Co.* v. *Industrial Accident Commission*, 44 Cal. App. 210 [186 Pac. 163].) The fact that Benefiel was paid a weekly salary which was proportionate to his labor, the fact that he delivered papers to individuals and not only in bulk, as well as the fact that a continuity of service was contemplated rather than a definite specified job, also support the con-

clusion that Benefiel was an employee of the Press Publishing Company.

[6] The term "employee" has been held to be synonymous with the word "servant." (*Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807, 810 [159 Pac. 721].) And servant as defined by section 2009 of the Civil Code is one "who is employed to render personal service to his employer, *otherwise than in pursuit of an independent calling,* and who in such service remains entirely under the control and direction of the latter who is called his master." It is insisted by both petitioners that because of the fact that Benefiel owned his own motorcycle, paying personally for its upkeep, gasoline, oil, etc., and also because of the fact that he carried packages and filled small orders for persons along his route in order to defray the expenses of his machine, it must be held that he was engaged in an independent calling, viz., in the conduct of a transfer business, and that it was in pursuit of this calling that he contracted both with Lucia K. Hicks and the Press Publishing Company. These facts, however, must be taken and considered in conjunction with the other facts of the case, which show, in substance, that Benefiel was not "engaged in the transfer business." Previous to his employment by Miss Hicks and the Press Publishing Company, Benefiel did not own a machine and attempted no transfer service of any kind. His motorcycle was purchased only at the time he undertook the service of delivering the cream and papers, and the carrying of packages was merely incidental to his main employment of performing his duties for them. Benefiel did not hold himself out to the public generally for messenger service nor had he any place where calls could be left for him. He only performed small errands for patrons along his route when requested by them. He never allowed this incidental service to interfere with his main work and never made more than the one trip during the day, which trip was made primarily in the performance of his duties as an employee of Miss Hicks and the Press Publishing Company. The amount which he received for this incidental service was trivial in comparison with his regular wages. It amounted at most only to enough to pay for the upkeep of his machine, and in the event that Benefiel had been discharged by either Miss Hicks or the Press Publishing Com-

pany there would have been no incidental business remaining to warrant him in making the trip. In view of the fact that the work for Miss Hicks and the Press Publishing Company was not incidental to this other business, but, on the contrary, this other work was merely incidental to their work, it cannot be said that Benefiel was engaged in the conduct of a "transfer business" and therefore was in pursuit of an independent calling at the time of the accident. The case of *Flickinger* v. *Industrial Accident Commission*, 181 Cal. 425 [19 A. L. R. 1150, 184 Pac. 851], cited in support of the contention that Benefiel was an independent contractor is readily distinguishable from the instant case. All the circumstances of that case pointed to an independent business of trucking carried on by the injured person prior to the accident which produced the injury, from a regular place of business, where the injured person received calls and made contracts for hauling and held himself out to the public generally as engaged in that business. Obviously, that case is not analogous to the instant case.

[7] We cannot agree with the separate contention of the Press Publishing Company that Benefiel at the time of the accident was outside the scope of his employment as to them merely because he was on the Modoc road after having gone to his mother's home for the empty milk cans. Although there is evidence that the Hollister road is the better paved road there is also evidence that the Modoc road was shorter and, furthermore, that due to bumps on the Hollister road it made but little difference to a motorcyclist which road he took. Either road, therefore, was a reasonable road to use for the purpose of the Press Publishing Company's business, and in the absence of definite instructions to the contrary, Benefiel was equally in the course of his employment when upon either road. It is not denied that the Press Publishing Company was aware of and acquiesced in the practice of Benefiel to take the Modoc road. There is no showing that the newspaper carriers were not privileged to select the road which they would take in reaching the commencement of their route for the delivery of papers to the first customer, and admittedly they were in the course of their employment from the time of procuring the papers from the newspaper office until they had completed their deliveries. At the time of the accident any deviation which Benefiel had made for

the purpose of performing duties for others than the Press Publishing Company had been completed and he was at that time engaged in the performance of his duty of carrying the papers in bulk preparatory to their delivery to individual customers.

The award of the commission may be annulled only if there is no substantial evidence in support of its findings. The award is affirmed.

Sloane, J., Waste, J., Lawlor, J., Wilbur, J., and Shaw, C. J., concurred.