[L. A. No. 22039. In Bank. Oct. 26, 1951.]

H. S. BRIETIGAM et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and ALFRED ROBBINS et al., Respondents.

...........................a.......d.... of the Industrial Acci-

.................................................Compensation, § 170:

Kearney, McCartney, Scott & Clopton and Mort L. Clopton for Petitioners.

Edmund J. Thomas, Jr., and Thomas L. Higbee for Respondents.

SPENCE, J.— Petitioners Brietigam and their insurance carrier, Pacific Employers Insurance Company, seek the annulment of an award of the Industrial Accident Commission in favor of respondent Alfred Robbins. No question is raised concerning Robbins' right to compensation, the only point in dispute being the identity of the persons liable therefor. The award was based on the finding that petitioners Brietigam were the sole employers of Robbins at the time of his injury. Petitioners contend that the evidence fails to support the existence of such employer-employee relationship, and that in so resolving the employment issue, respondent commission acted in excess of its jurisdiction. (Lab. Code, § 5952.) But the record does not sustain their position.

In June, 1948, petitioners Brietigam, doing business as the Lemoore Grain and Feed Company, contracted to purchase a quantity of barley from the B. V. Farming Company of Bakersfield at "3.12½ f.o.b. in pile Buena Vista or at 3.15 per cwt. f.o.b. cars Buena Vista." The barley was part of a grain crop grown by the F. & H. Farming Company, consisting of Francis Houchin and a Mr. Freeborn, on farm land at Buena Vista leased by the B. V. Farming Company, which company was owned by C. E. Houchin, an uncle of Francis Houchin. The latter was in charge at the field where the crop was grown, and he had his own crew to harvest the grain. Both farming companies, by reason of contractual arrangements covering the raising and handling of the grain crop, had an interest in the barley purchased by petitioners Brietigam. The B. V. Farming Company owned a grain-storage warehouse, which was in charge of its employee Buford L. Fox.

The grain was harvested and deposited at a spot known as the Levee Spur, situated on the Buena Vista farm land itself. Initially the grain was there loaded on freight cars for rail shipment, with the loading being done by five truckers hired by Francis Houchin at the rate of $1.00 per ton. Later, in July, 1948, a railroad embargo prevented further shipment as originally contemplated, and other arrangements for handling the barley purchase had to be made between the parties. C. E. Houchin telephoned petitioner H. S. Brietigam and insisted

that he take delivery or be considered in default. Brietigam thereupon arranged with C. E. Houchin for storage of the grain in the latter's warehouse. Subsequently Brietigam had a telephone conversation with Fox, the employee of C. E. Houchin in charge of the warehouse, wherein Fox suggested that Brietigam use the truckers who were already on the job for hauling the grain from the pile to the warehouse. Brietigam agreed to that arrangement and to the hauling rate of $1.60 per ton (as distinguished from the previous rate of $1.00 per ton). Each of the truckers was licensed as a public carrier, and they arranged for three "swampers" to perform the loading operations at the rate of 30 cents per ton, such amount to be paid from the $1.60 per ton rate received by the truckers. A loading machine was furnished by C. E. Houchin. On July 23, 1948, while operating this machine in transferring the grain from the pile to the truck for the haul to the warehouse, Robbins, one of the swampers, sustained the injury which is the subject of the challenged award.

The actual deal with the truckers in regard to the grain loading for delivery to the warehouse was made by Francis Houchin according to the price agreement reached between Brietigam and Fox for that work. Francis Houchin continued to direct the loading operations at the farm, and Fox directed the unloading operations at the warehouse. From the truckers' testimony, it appears that there was a variety of opinion among them as to the employment arrangements: some thought they were working for Francis Houchin since he "bossed" the loading, while others thought they were working for Brietigam in line with their understanding that the price rate for the hauling represented what he was willing to pay therefor. To cover the first few days' hauling expense under the $1.60 per ton rate, Brietigam (Lemoore Grain and Feed Company) sent a "lump-sum check" to the B. V. Farming Company, but this procedure did not meet with the latter company's approval as indicated by the bookkeeper's letter to the Lemoore Grain and Feed Company under date of July 21, 1948. As here pertinent, the letter read: "We requested that you forward your checks made payable to each trucker for the amount due him, and as a matter of assistance to you we would see that the checks were delivered to them. We now have a check from you in the amount of $706.36 which covers the amount due the truckers for July 15, 16 & 17. This check was made out to B. V. Farming Company and inasmuch as these truckers were in need of money and were threatening

to discontinue their hauling operations unless they received some money, we issued checks to the truckers for an amount equal to your check. . . . *In the future, will you kindly see that your checks are payable directly to the truckers, as these men are not employed by us, and you can readily see where it would cause us unnecessary bookkeeping, etc. to have to issue checks for your men.* We handled it for you this time as a matter of convenience to you, but would appreciate it very much if you would issue all future checks directly to the men *handling your hauling.*" (Italics added.) Thereafter the Lemoore Grain and Feed Company made out individual checks for transmittal to the truckers according to their respective charges.

Following delivery to the warehouse, negotiable warehouse receipts were issued showing the number of sacks of barley "received on storage from B. V. Farming Company for account of Lemoore Grain & Feed Company." With respect to "taking delivery of the grain," Brietigam testified: "It's not my property until its aboard the truck, and if it calls for f.o.b. pile, *I take delivery at the pile. It becomes my property when I take it out of the pile.*" (Italics added.) In further explanation, he added: "*I meant that when we buy it f.o.b. at the pile, it doesn't become our property until we take delivery out of the pile. . . . Once it's removed from the pile it's our property.*" (Italics added.)

The decisive question in the case is the relationship between petitioners and the truckers. If the truckers were employees of petitioners Brietigam, then Robbins, the injured "swamper," who was hired by the truckers for the loading work, was also an employee of petitioners Brietigam. (*S. A. Gerrard Co.* v. *Industrial Acc. Com.,* 17 Cal.2d 411, 413-414 [110 P.2d 377]; also *Keeling* v. *Industrial Acc. Com.,* 16 Cal. App.2d 733, 735 [61 P.2d 373].) However, if the truckers were independent contractors, then Robbins, as their employee, would have no rights against petitioners. (*State Compensation Insurance Fund* v. *Industrial Acc. Com.,* 46 Cal.App.2d 526, 529 [116 P.2d 173].) Likewise the "essential employer-employee relationship" would be lacking if, as argued by petitioners, Robbins was hired by the truckers, who were in turn employees of either of the Houchins or of both, to the exclusion of any employment status with petitioners. While there is some evidence tending to indicate each of the suggested employment relationships, there appears to be ample evidence which supports the finding of respondent commission

that Robbins was an employee solely of petitioners Brietigam.
█ So pertinent is the settled rule that ''[w]here findings made by the commission are supported by substantial evidence, or by inferences which may fairly be drawn from the evidence, even though the evidence be susceptible of opposing inferences, those findings will not be disturbed by an appellate tribunal.'' (*Schaller* v. *Industrial Acc. Com.*, 11 Cal. 2d 46, 50 [77 P.2d 836] ; see, also, *Coborn* v. *Industrial Acc. Com.*, 31 Cal.2d 713, 716-717 [192 P.2d 959].)

█ From the record it may reasonably be inferred that the hauling arrangement made with the truckers following the railroad embargo contemplated an entirely new contract of employment pursuant to petitioners Brietigam carrying through their storage arrangement with C. E. Houchin, rather than simply, as petitioners maintain, a continuation of the former agreement with a mere change in the destination of the barley and an appropriate modification of the tonnage rate for hauling. As heretofore stated, there were two alternate methods of delivery provided in the original contract of purchase of the barley: (1) the seller would deliver it f.o.b. the railroad cars for $3.15 per hundred weight or (2) the buyer could pick it up out of the pile at the railside for the lesser sum of $3.12½ per hundredweight, and the hauling cost from there presumably would be the buyer's obligation. So it would seem that when petitioners Brietigam were paying the stipulated higher price under the first arrangement, title to the grain would not pass until it was placed in the cars and the truckers in hauling to the designated place of delivery were working for the seller; but when petitioners changed to the second arrangement at the lower price with delivery at the roadside pile, the trucking thereafter became petitioners' responsibility, with the Houchins acting as their agents and lending what assistance they could as a matter of gratuitous cooperation. While petitioners cite the form of the warehouse receipts—''Received in storage from B. V. Farming Company for account of Lemoore Grain and Feed Company''—as indicating that title to the grain did not pass until it was warehoused, yet certain testimony of H. S. Brietigam, one of the petitioners, clearly indicated that title to the grain passed to petitioners when they took it ''out of the pile.'' In line with such testimony, the form of the warehouse receipts might be regarded as no more than a means of identifying the source of a particular lot of grain rather than a mark of title transfer.

Admittedly petitioners Brietigam were using for the hauling operations specified individual truckers who were not part of the farming and grain storage business of the Houchins' respective companies. In support of the understanding of the parties that these truckers were the employees of petitioners Brietigam is the above-quoted letter of the B. V. Farming Company under date of July 21, 1948—two days before the injury to Robbins—requesting the Lemoore Grain and Feed Company thenceforth to make their "checks . . . payable directly to the truckers, *as these men are not employed by us* [B. V. Farming Company] . . . [but are] *handling your* [Lemoore Grain and Feed Company] *hauling*"; and petitioners Brietigam thereafter so complied by issuing individual checks to the respective truckers. ■ Although "the mere payment of wages or salary, *of itself*, is insufficient to establish that the recipient thereof is the servant of the one paying the same" (italics added), (*Independence Indemnity Co.* v. *Industrial Acc. Com.*, 203 Cal. 51, 58 [262 P. 757]) ; that factor is a consideration in the overall view of the employment question. (*Press Publishing Co.* v. *Industrial Acc. Com.*, 190 Cal. 114, 117-118, 121 [210 P. 820] ; *Keeling* v. *Industrial Acc. Com.*, *supra*, 16 Cal.App.2d 733, 735.) ■ While it is not entirely clear from the record as to who in the C. E. Houchin organization contacted Francis Houchin in regard to the matter of securing the trucking services, apparently the latter understood that such services were for petitioners Brietigam. Francis Houchin obtained the truckers as specified according to the agreement made between Brietigam and Fox in their telephone conversation, and he offered the truckers the precise tonnage rate for the hauling that Brietigam was willing to pay. Petitioners argue that some of the truckers thought they were working for Francis Houchin, and that to "create the relationship of employer and employee or master and servant, there must be an express or implied contract or acts such as will show that the parties recognize one as the employer and the other as the employee." (*Larson* v. *Lewis-Simas-Jones Co.*, 29 Cal.App.2d 83, 89 [84 P.2d 296].) But such cited language was used in testing the difference between an employee and a party to a joint adventure, a situation distinguishable from that here in question, involving acts of an alleged agent in hiring help for the benefit of another, and so establishing between the latter parties an employer-employee status. (Schneider on Workmen's Compensation, Vol. I, p. 617; *Yolo Water & Power Co.* v. *Industrial Acc.*

*Com.*, 35 Cal.App. 14, 16-17 [168 P. 1146].) While petitioners Brietigam apparently did not direct the truckers or their helpers, the swampers, in their loading and hauling operations, it is the "right to control and direct the activities of the alleged employee, . . . whether exercised or not, [that] gives rise to the employment relationship." (*Industrial Indemnity Exch.* v. *Industrial Acc. Com.*, 26 Cal.2d 130, 135 [156 P.2d 926], and cases cited.) In view of the evidence bearing on the ownership of the grain by petitioners Brietigam at the time of performance of the trucking services and their payment of the truckers, it may reasonably be inferred that the Brietigams had the necessary right of control as well as the authority to discharge at will any of the truckers or their helpers in the event their services were no longer wanted—another factor constituting strong evidentiary support of the employment relationship. (*Riskin* v. *Industrial Acc. Com.*, 23 Cal.2d 248, 253 [144 P.2d 16].) So distinguishable on their respective facts are the cases cited by petitioners where it appeared that an independent contractor relationship intervened and that the alleged employer did not have the right to terminate the work at his pleasure: *Freiden* v. *Industrial Acc. Com.*, 190 Cal. 48, 50 [210 P. 420]; *Winther* v. *Industrial Acc. Com.*, 16 Cal.App.2d 131, 137-138 [60 P.2d 342]; *State Compensation Ins. Fund* v. *Industrial Acc. Com.*, *supra*, 46 Cal.App.2d 526, 529-530. (See *Riskin* v. *Industrial Acc. Com.*, *supra*, 23 Cal.2d 248, 255-256.)

Since the conflicting evidence was clearly susceptible of opposing inferences, and the inference drawn by respondent commission on the employment issue was amply supported, the commission's finding will not be disturbed.

The award is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.