[No. C049013. Third Dist. Apr. 13, 2006.]

SULLY-MILLER CONTRACTING COMPANY, Plaintiff and Appellant, v. CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD, Defendant and Respondent;
DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, Real Party in Interest and Respondent.

COUNSEL

Robert D. Peterson for Plaintiff and Appellant.

Robert N. Villalovos, Assistant Chief Counsel, Douglas G. Nareau, Chief Counsel; and James A. Madden, Jr., for Defendant and Respondent.

Michael D. Mason and David W. Pies for Real Party in Interest and Respondent.

OPINION

**BLEASE, Acting P. J.**—In this workplace safety enforcement action, petitioner, Sully-Miller Contracting Company (Sully-Miller) is an asphalt paving company that leased Jeff Moreno, one of its longtime employees, to Manhole Adjusting, Inc. (Manhole), as a roller operator. While working at Manhole's worksite, Moreno was fatally injured when he was thrown from his roller because it lacked an operable seatbelt.

Real party in interest, the Department of Industrial Relations Division of Occupational Safety and Health (Division), cited Sully-Miller for a serious violation of the employer safety provisions set forth in title 8 of the California Code of Regulations (hereafter Regulations). The citation alleged

that Sully-Miller failed to have an injury prevention program in which it instructed Moreno to refuse to work at the secondary site until he was given a roller with an operative seatbelt and failed to conduct periodic monitoring of the site to determine compliance with its program. Sully-Miller's appeal of the citation was denied by respondent Occupational Safety and Health Appeals Board (Board) and by the trial court. (Code Civ. Proc., § 1094.5.)

On appeal, Sully-Miller contends (1) there is no legal basis for a dual-employer theory of responsibility, (2) Moreno was not its employee when he was fatally injured, (3) Labor Code section 6401.7, subdivision (h)[1] eliminated the primary employer's obligation to provide safety training to an employee who works under the direct supervision of another employer, and (4) there is insufficient evidence to support the finding that Sully-Miller's injury prevention program did not satisfy the regulations.

We shall conclude that Sully-Miller, as a primary employer of Moreno, was required by section 6401.7 to establish, implement and maintain an effective injury prevention program for employees leased to a secondary employer. The program must include training applicable to the work for which the employee is leased and the monitoring of the secondary employer to ensure that the safety program is implemented. In this case, Moreno should have been instructed by Sully-Miller to refuse to operate a roller for Manhole without an operable seatbelt.

Accordingly, we find no error and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Violation*

Sully-Miller is an asphalt paving contractor who had employed Jeff Moreno for 22 years as a roller operator. Moreno was still on Sully-Miller's payroll in October 1998, but he had been without work for a number of days and was not receiving compensation for his time off work.

During this time, Manhole, another paving contractor, requested Sully-Miller to provide it with two qualified roller operators. Sully-Miller contacted Moreno, an experienced roller and heavy equipment operator, and advised him about the Manhole job. After Moreno indicated he would be willing to work for Manhole, Sully-Miller agreed to rent Moreno to Manhole for three days.

---

[1] A reference to a section is to the Labor Code unless otherwise designated.

On October 1, 1998, the first day of the job, Moreno was operating a heavy roller on a steep grade when another roller, further up the grade, went out of control and rammed the rear end of Moreno's roller. Moreno was thrown to the pavement and into the path of his roller's rear wheels, resulting in fatal injuries. At the time of the accident, Moreno was not wearing his seatbelt. The Board found "[t]he leased roller Moreno was operating at the time was equipped with a seat belt, but it was unusable because the metal tip of the belt, which slides into the locking receptacle, was missing."[2]

After his death, Sully-Miller paid Moreno's family for his work at Manhole and billed Manhole for Moreno's wages and benefits, as well as a substantial rental fee that almost doubled the wages.[3] Moreno was under Manhole's exclusive direction and control while he worked at its site.

Sully-Miller knew Moreno would be assigned to work as a heavy roller operator but it had no agreement with Manhole concerning enforcement of its injury prevention program at the site. Nor did Sully-Miller inspect the site before Moreno began working and it had no system in place for making periodic on-site inspections or to otherwise ensure such inspections were made. Sully-Miller's injury prevention program contained no provision requiring that an employee assigned to work under the direction and control of another employer must be instructed that if he reasonably believes the work to which he is assigned exposes him to a dangerous condition, he should refuse to perform the work until the danger is abated. Nor was Moreno so instructed when he was assigned to work for Manhole.

### B. *Citation and Appeal*

The Division, which is vested with primary responsibility for administering and enforcing the California Occupational Safety and Health Act of 1973 (the Act) (§ 6300 et seq.; *Rick's Electric, Inc. v. Occupational Safety & Health Appeals Bd.* (2000) 80 Cal.App.4th 1023, 1026 [95 Cal.Rptr.2d 847]), cited Sully-Miller for a serious violation of section 1509 of the Regulations.

The citation alleged (1) Moreno was not wearing a seatbelt at the time he was ejected from his roller, (2) Sully-Miller had no system for a secondary worksite to ensure employees' compliance with safe practices required by its

---

[2] Sully-Miller did not contest this finding. To the contrary, in its petition for reconsideration, it stated that "[t]he seat belt on the roller operated by Mr. Moreno was not functioning and consequently it was not available for him to utilize." Despite this state of the record, during oral argument, counsel for Sully-Miller implied that the incident itself led to the malfunction. Clearly that assertion is not supported by the undisputed findings of the Board.

[3] Sully-Miller paid Moreno at a rate of $26 and change but charged Manhole $47.50 for his services.

own injury prevention program and section 3203, subdivision (a)(2) of the Regulations, and (3) Sully-Miller had no system of periodic on-site monitoring to ensure compliance with safe work practices and conditions as required by section 3203, subdivision (a)(4) of the Regulations. The citation proposed a civil penalty of $2,500.

An administrative law judge (ALJ) granted Sully-Miller's appeal of the citation. The Board then granted the Division's petition for reconsideration and reversed the decision of the ALJ and ruled in favor of the Division.

Sully-Miller filed a petition for writ of administrative mandate seeking an order directing the Board to set aside its decision after reconsideration. (Code Civ. Proc., § 1094.5; Lab. Code, § 6627.) The trial court denied the petition and Sully-Miller filed a timely appeal from the ensuing judgment.

DISCUSSION

I

Moreno Was Sully-Miller's Primary Employee

Section 6401.7, subdivision (a) requires that every employer establish, implement, and maintain an effective injury prevention program. The Board has interpreted this provision and the related Regulations to require that a primary employer provide safety training to an employee it has leased to a secondary employer that directly supervises and controls the work of the employee at a secondary worksite. (*In re Optical Coating Laboratory, Inc.* (Cal. OSHA App.Bd., Sept. 28, 1984, No. 82-R1D5-1093); *In re Petroleum Maintenance Company* (Cal. OSHA App.Bd., May 1, 1985, No. 81-R4D1-594-599) (*PEMCO II*); *In re Manpower* (Cal. OSHA App.Bd., May 14, 2001, No. 98-R4D5-4158).)

Sully-Miller contends there is no legal basis for a dual employer theory of responsibility and there is no substantial evidence that Moreno was its employee at the time of his fatal accident because he was not working under its direct supervision and control at that time.

The Board and the Division argue that Sully-Miller waived the first claim by failing to raise it before the Board and the trial court and there is substantial evidence to support the Board's finding that Sully-Miller was Moreno's primary employer at the time in question.

We agree with the Board and the Division on both points. Sully-Miller has forfeited the first claim. (§§ 6614, 6618.)[4] However, because it is pertinent to our substantial evidence discussion, we shall address it.

As stated, the Board found the employment relationship between Moreno, Sully-Miller, and Manhole was one of dual employment, in which Sully-Miller was Moreno's primary employer and Manhole was his secondary employer. Upon review of this finding, we apply the same standard of review used by the trial court in ruling on the petition for the writ.

We determine whether based on the entire record the Board's decision is supported by substantial evidence and is reasonable. (§ 6629; *Davey, supra,* 167 Cal.App.3d at p. 1240; *Rick's Electric, Inc. v. California Occupational Safety and Health Appeals Bd., supra,* 80 Cal.App.4th at pp. 1033–1034.) Under this standard, we will not disturb the Board's findings if they are reasonable, even if the evidence is susceptible of opposing inferences. (*Brietigam v. Industrial Acc. Comm.* (1951) 37 Cal.2d 849, 853 [236 P.2d 582].)

 We review the Board's findings in light of the statutory definitions governing an employment relationship. The Act defines "Employee" as "every person who is required or directed by any employer to engage in any employment or to go to work or be at any time in any place of employment." (§ 6304.1, subd. (a).) The Act defines "Employer" by inclusion of the definition in section 3300, which defines "Employer" for purposes of the workers' compensation law. (§ 6304.) Section 3300 provides in pertinent part that an employer is "[e]very person . . . which has any natural person in service." (§ 3300, subd. (c).)

---

[4] A court may not review a matter arising out of the final decision by the Board or a hearing officer unless the Board on its own motion sets the decision aside or a petition for reconsideration of the decision is filed and the Board either grants or denies reconsideration. (§ 6615.) A party aggrieved by a decision of the Board or a hearing officer may petition the Board for reconsideration "in respect to any matters determined or covered by the . . . decision and specified in the petition for reconsideration." (§ 6614.) All matters not raised in the petition for reconsideration are "deemed . . . waived . . . ." (§ 6618.) Unless an issue is presented to the Board upon reconsideration, it is not properly before the court. (*Ibid; Davey Tree Surgery Co. v. Occupational Safety & Health Appeals Bd.* (1985) 167 Cal.App.3d 1232, 1243 [213 Cal.Rptr. 806] (*Davey*).)

The decision in this case was based on the legal theory and factual finding that Sully-Miller was Moreno's primary employee. Sully-Miller did not challenge the legal basis for this theory before the Board or in the trial court in its petition for writ of mandate, essentially conceding the question at the administrative hearing. It has therefore forfeited the claim by failing to raise it before the Board.

Pertinent factors include the payment of a wage or salary and whether the employer has the right to exercise control over the employee. (*Brietigam v. Industrial Acc. Comm., supra,* 37 Cal.2d at pp. 854–855.) The fact an employer does not exercise its right of control is not dispositive on the question of an employment relationship because it is the right to control and not the exercise of that right that is the test. (*Ibid.*; *In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 731 [199 Cal.Rptr. 697].)

The instant case involves dual employers, a concept that has long been recognized in the area of worker's compensation in which employers may be joint or general and special. (See *Employers' L. A. Corp. v. Indus. Acc. Com. of California* (1918) 179 Cal. 432, 438–439 [177 P. 273]; *Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 209 [77 Cal.Rptr.2d 660]; *In-Home Supportive Services v. Workers' Comp. Appeals Bd., supra,* 152 Cal.App.3d at p. 732.)

█ Because the definition of "employer" used in the Act is that stated in the law governing worker's compensation, we must assume the Legislature intended that the term "employer" be given the same meaning under both worker's compensation and worker safety law. (*Department of Revenue of Ore. v. ACF Industries, Inc.* (1994) 510 U.S. 332, 342 [127 L.Ed.2d 165, 175, 114 S.Ct. 843]; *Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404].) We shall therefore treat the cases construing section 3300 as equally applicable to section 6304.[5]

█ In the context of worker's compensation, the court in *Brassinga v. City of Mountain View, supra,* 66 Cal.App.4th at page 209, stated that dual employment occurs when " ' "an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee . . . ." ' " In such case, " ' "that employee may be held to have two employers—his original or 'general' employer and a second, the 'special' employer." ' " (*Ibid.*)

---

[5] The Board also has looked to worker's compensation law in holding that the concept of dual employers applies equally to the law of workplace safety. (*In re Optical Coating Laboratory, Inc., supra,* No. 82-R1D5-1093; *PEMCO II, supra,* No. 81-R4D1-594-599; *In re Manpower, supra,* No. 98-R4D5-4158.) We must give great weight to the Board's interpretation of the statutes and regulations it is charged with enforcing unless that interpretation is clearly erroneous or unauthorized. (*Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639 [2 Cal.Rptr.2d 297]; *Davey, supra,* 167 Cal.App.3d at p. 1244.)

Applying these principles, we find there is substantial evidence to support the finding that Sully-Miller was Moreno's primary employer at the time of his death. Moreno had been employed by Sully-Miller for approximately 22 years when Manhole contacted Sully-Miller and requested to borrow a roller operator. At that time, although Moreno was without work and was not receiving an hourly wage from Sully-Miller, he remained on Sully-Miller's payroll and had not been laid off.

Randy Franklin, Sully-Miller's safety and risk manager, acknowledged that Moreno was still "technically" an employee of the company and that the company expected him to resume working for it directly as soon as work was available. As Sully-Miller explained at the hearing and at oral argument, it is customary in the industry for a company that is short of manpower to call another company to borrow an employee who is not working.

After Manhole made its request for two roller operators, Sully-Miller contacted Moreno and entered Manhole's request on a form entitled "Equipment Rental Dispatch Info." The accident report prepared by Sully-Miller also stated that Moreno "was *rented* to Manhole Adjusting as a roller operator" (italics added), as did its daily work report and the invoice sent to Manhole for Moreno's services.

The fact Manhole contacted Sully-Miller and Sully-Miller in turn contacted Moreno raises an inference that Moreno was Sully-Miller's employee. This inference is strengthened by the fact that Sully-Miller issued a payroll check to Moreno's family for Moreno's work at Manhole and billed Manhole for its costs, including Moreno's wages and benefits, and a substantial rental fee that was almost as much as Moreno's wage. These circumstances show that Sully-Miller considered Moreno to be its employee and that Sully-Miller retained the right to direct him to perform work or go to a place of work. By waiting for Sully-Miller to call him back instead of insisting on formal layoff when out of work, Moreno demonstrated continuing reliance upon and commitment to his employment relationship with Sully-Miller. This benefited Sully-Miller by allowing it to retain a valuable employee rather than lose him to another company.

However, Sully-Miller maintains that because it did not require or force Moreno to work for Manhole, it did not have the right to control him. This argument was rejected in *Harris v. Chisamore* (1970) 5 Cal.App.3d 494, 498 [85 Cal.Rptr. 223]. In so doing, the court looked to section 6402, which uses the word "permit" with reference to employment. "No employer shall *require,*

*or permit* any employee to go or be in any employment or place of employment which is not safe and healthful." (Italics added.) The word "permit" also appears in section 6303, subdivision (b), which defines employment to include any "trade, enterprise, project . . . or work . . . in which any person is engaged or *permitted* to work for hire . . . ." (Italics added.)

As stated, section 6304.1, subdivision (a) defines "employee" to mean "every person who is required or directed by any employer to engage" in employment or work. The dictionary defines "directed" to mean "subject to regulation by a guiding and supervising agency." (Webster's 3d New Internat. Dict. (1971) p. 640.) By contrast, the definition of the word "require" includes the imposition of "a compulsion or command upon (as a person) to do something." (*Id.* at p. 1929.)

■ When construing the words of a statute, we give meaning to each word if possible and avoid a construction that would render a term surplusage. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) ■ In light of this rule of construction and the Labor Code's use of the word "permit" in the context of the employment relationship, we hold that the word "directed" in section 6304.1, subdivision (a) means to give supervision or direction rather than to force or compel.

■ The evidence satisfies this definition. Because Moreno risked possible layoff, he was not in a good position to refuse work at Manhole's worksite. Not surprisingly, he decided to resume his status as a paid employee of Sully-Martin by agreeing to work under Manhole's direct supervision and control pursuant to a lease agreement between Sully-Miller and Manhole. In light of the industry's custom for one company to lease its employee to another company that is short on manpower, the substantial rental fee Sully-Miller received for Moreno, and its classification of him as "equipment" to be leased, Sully-Miller cannot credibly argue that Moreno was not its employee. Accordingly, we reject its claim of error.

II

Section 6401.7

Sully-Miller contends section 6401.7, subdivision (h) (hereafter subdivision (h)), places responsibility for providing an injury prevention program exclusively on the employer who has direct supervision and control over the

employee. From this premise it reasons that, because it was not directly supervising Moreno, it had no obligation to provide injury prevention training to him for hazards at Manhole's worksite. The Board and Division counter that subdivision (h) did not alter the primary employer's general responsibility to provide injury prevention training for all of its employees, including those that work for a secondary employer. We agree with the latter view.

Subdivision (h) provides that "[t]he employer's injury prevention program, as required by this section, shall cover all of the employer's employees and all other workers who the employer controls or directs and directly supervises on the job to the extent these workers are exposed to worksite and job assignment specific hazards. Nothing in this subdivision shall affect the obligations of a contractor or other employer that controls or directs and directly supervises its own employees on the job."

Consistent with the rules for statutory construction, we first set forth the statutory and regulatory framework to which subdivision (h) was added. An employer's general responsibilities with respect to injury prevention programs are set forth in subdivision (a) of section 6401.7. Subdivision (a) requires that "[e]very employer shall establish, implement, and maintain an effective injury prevention program," which shall include inter alia, a system for identifying and evaluating workplace hazards, including scheduled periodic inspections to identify unsafe conditions and work practices (*id.*, subd. (a)(2)), methods and procedures for timely correction of unsafe or unhealthy conditions and practices (*id.*, subd. (a)(3)), "[a]n occupational health and safety training program designed to instruct employees in general safe and healthy work practices and to provide specific instruction with respect to hazards specific to each employee's job assignment" (*id.*, subd. (a)(4)), the employer's system for communicating with employees on occupational health and safety matters including provisions designed to encourage employees to inform the employer of hazards at the worksite without fear of reprisal (*id.*, subd. (a)(5)), and a system for ensuring that employees comply with safe and healthy work practices. (*Id.*, subd. (a)(6).) Subdivision (c) requires the employer to provide such training to "all employees when the training program is first established, all new employees, and all employees given a new job assignment . . . ."

In *PEMCO II, supra,* No. 81-R4D1-594-599, the Board set forth the training obligations that arise under sections 6400 through 6405 when "the primary employer's principal business is the supplying of labor to secondary employers, or the supplying of labor is the primary employer's principal obligation under its agreement with the secondary employer, and the primary employer has no right in its relationship with the secondary employer to direct the contract employees in the work to be done or how to do it." The Board

noted that sections 6400 through 6405 place primary responsibility for employee safety and health upon the employer, which includes the primary employer. The Board concluded that "[t]o meet these Labor Code responsibilities, the primary employer is required to determine with particularity the work which a contract employee will be called upon to perform for the secondary employer. It shall maintain an accident prevention program and send out only employees who are trained to do the work . . . . It is the responsibility of the primary employer to instruct contract employees in the use of personal protective equipment required for the work to which they are to be assigned. Contract employees must know that if they reasonably believe a job to which they are assigned by the secondary employer is dangerous, they shall refuse to do the work until the danger has been abated, and that such refusal will not result in sanctions against them by the primary employer."

Because *PEMCO II* involved the obligations of a primary employer when it supplies labor to a secondary employer, the Board did not determine the extent and scope of the training and inspection responsibilities of the secondary employer. It was in this context that in 1991 the Legislature added subdivision (h) to section 6401.7. (Stats. 1991, ch. 964, § 1, p. 4523.) It contains no words of exception that limit an employer's obligation to establish and implement an injury prevention program. To the contrary, the text states that an "employer's injury prevention program, as required by this section, shall cover all of the employer's employees *and* all other workers who the employer controls or directs and directly supervises on the job to the extent these workers are exposed to worksite and job assignment specific hazards." (Italics added.)

It is apparent from the language and organization of subdivision (h), that "directly supervises" modifies "other workers" under the control and supervision of an employer and not employees. Because this provision applies to both the employer's employees, without regard to direct supervision, and "all other" workers subject to the employer's direct supervision, it codifies *PEMCO II*'s holding with respect to primary employers while making clear that a secondary employer has similar obligations to employees it directly supervises. Moreover, the second sentence, which states that "[n]othing in this subdivision shall affect the obligations of a contractor or other employer that controls or directs and directly supervises its own employees on the job," makes clear that a secondary employer's training obligations to its primary employees remain the same. (§ 6401.7, subd. (h).)

■ In sum, subdivision (h) serves to impose training obligations on a secondary employer who directly supervises contract employees employed by another employer. It in no way alters the established training obligations of an employer to primary employees, whether or not the employer leases those employees to or from another employer.

This conclusion is also consistent with the legislative history.[6] Subdivision (h) was added by Assembly Bill No. 1495 (1991–1992 Reg. Sess.) in 1991. The Legislative Counsel's Digest states that the bill "would additionally require" that all contract workers be included in the secondary employer's injury prevention program to the extent they are "exposed to worksite and job assignment specific hazards." (Legis. Counsel's Dig., Assem. Bill No. 1495 (1991–1992 Reg. Sess.) 4 Stats. 1991, Summary Dig., p. 434.) It says nothing about eliminating the primary employer's existing obligation to provide such training.

Legislative committee reports and analysis also uniformly indicate that the need for Assembly Bill No. 1495 arose because existing law at the time neglected the safety needs of contracted employees who work with an employer's own workers. The provision was therefore intended to expand the employer's mandated injury prevention program responsibilities to include not only its own employees, but all other workers whom it controls or directs on the job. (Assem. Com. on Labor and Employment, Rep. on Assem. Bill No. 1495 (1991–1992 Reg. Sess.) as introduced, p. 1.) According to an analysis by the Senate Committee on Industrial Relations, the purpose of the bill was to "require an employer's injury prevention program to cover workers employed by others if the workers are controlled or directed and supervised on the job by the employer and are exposed to worksite and job assignment hazards." (Sen. Com. on Industrial Relations, com. on Assem. Bill No. 1495 (1991–1992 Reg. Sess.) July 10, 1991, at p. 1; see also Assem. Com. on Labor and Employment, Republican Analysis on Assem. Bill No. 1495 (1991–1992 Reg. Sess.) April 27, 1991 [the bill requires secondary employers to broaden their injury prevention programs to include contract employees, if supervised by the employer].)

■ Moreover, it is well established that a proviso that limits the scope of a general provision must be strictly construed so that any exception must fall fairly within its terms. (*People ex rel. S.F. Bay etc. Com. v. Town of Emeryville* (1968) 69 Cal.2d 533, 543 [72 Cal.Rptr. 790, 446 P.2d 790].) Section 6401.7,

---

[6] When looking to legislative history, we may consider legislative committee reports and analyses, including statements pertaining to the bill's purpose (*Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326]) and the Legislative Counsel's Digest. (*Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 482–483 [5 Cal.Rptr.3d 283]; *People v. Allen* (2001) 88 Cal.App.4th 986, 995–996 [106 Cal.Rptr.2d 253].)

subdivision (a)(4) is a broad provision that requires "every employer" to provide "specific instruction with respect to hazards specific to each employee's job assignment." Therefore, to the extent subdivision (h) restricts those requirements, it must be strictly construed. Subdivision (h) has no clear words of limitation. Because the manifest purpose of Assembly Bill No. 1495 was to clarify the training obligations of secondary employers and not to alter the existing obligations of primary employers, we reject Sully-Miller's proposed construction.

Nevertheless, Sully-Miller adopts the argument of the ALJ, who found it unrealistic to expect an employer that rents employees to other employers to learn enough about the hazards specific to the secondary employers' facilities and job assignments to provide the rented employees with effective safety training. We disagree.

Under section 6401.7, subdivision (a)(4), the primary employer's general training responsibilities include "general safe and healthy work practices and . . . specific instruction with respect to hazards specific to each employee's job assignment." According to *PEMCO II, supra*, No. 81-R4D1-594-599, "[t]o meet these Labor Code responsibilities, the primary employer is required to determine with particularity the work which a contract employee will be called upon to perform for the secondary employer. It shall maintain an accident prevention program and send out only employees who are trained to do the work . . . ."

We need not determine whether, in some hypothetical case, it is unrealistic to expect a primary employer to learn the hazards specific to a secondary jobsite, because in this case the work Moreno performed for Sully-Miller was the same work he was directed to perform for Manhole. Thus, the same general safety hazards and precautions were applicable and no additional expertise or knowledge was required. Indeed, Sully-Miller had a rule in its injury prevention program covering its primary employees relating to the specific hazard in question and instructed its operators to wear a seat belt when operating an asphalt roller. Thus, because the subject was covered in Sully-Miller's training program, it was not beyond its area of expertise.

Sully-Miller also argues that under worker's compensation law, when a worker is injured while working for a different employer, that person is only entitled to compensation benefits from that employer, not from both employers. It asserts that the same principle should operate for workplace safety responsibility.

While we agree the same principle should operate in both areas of the law, Sully-Miller's argument is flawed because it is based on the erroneous view that liability under worker's compensation law is limited to one employer. It is not. (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 175 [151 Cal.Rptr. 671, 588 P.2d 811] [when "general and special employment exist, 'the injured workman can look to both employers for [worker's] compensation benefits' "]; *Brassinga v. City of Mt. View, supra,* 66 Cal.App.4th at p. 209.)

■ For these reasons, we conclude subdivision (h) does not relieve a primary employer of its responsibilities for providing general safety training to its employee when it leases that employee to a secondary employer.

## III

### Sully-Miller's Injury Prevention Program Failed to Satisfy the Cited Regulation

Sully-Miller contends it did not violate section 1509 and section 3203 of the Regulations (hereafter section 1509 and section 3203) because it had an effective injury and prevention program, which was not deficient under the Regulations. The Division has not responded to this claim. The Board contends the claim has no merit. We agree with the Board.

■ Regulations, section 1509, subdivision (a) requires that "[e]very employer shall establish, implement and maintain an effective Injury and Illness Prevention Program in accordance with section 3203 of the General Industry Safety Orders." Regulations, section 3203, subdivision (a) of the safety orders specifies that the injury prevention program shall be in writing and what it shall include.

Sully-Miller was cited for violating Regulations, section 3203, subdivision (a)(2) by failing to have a system for the secondary site to ensure employees' compliance with safe practices and for violating section 3203, subdivision (a)(4) by failing to establish and adhere to a system of periodic monitoring of a secondary employer site to determine compliance with safe work practices and conditions.

Regulations, section 3203, subdivision (a)(2) states that the injury prevention program shall "[i]nclude a system for ensuring that employees comply with safe and healthy work practices. Substantial compliance with this provision includes recognition of employees who follow safe and healthful work practices, training and retraining programs, disciplinary actions, or any other such means that ensures employee compliance with safe and healthful work practices."

Regulations, section 3203, subdivision (a)(4) requires that the injury prevention program shall "[i]nclude procedures for identifying and evaluating work place hazards including scheduled periodic inspections to identify unsafe conditions and work practices. Inspections should be made to identify and evaluate hazards . . . ."

 The Board has interpreted these regulations to require certain training and inspection obligations. As discussed in part II, in *PEMCO II, supra,* No. 81-R4D1-594-599, the Board held that when the primary employer supplies labor to a secondary employer, it shall (1) determine with particularity the work each contract employee will be called upon to perform for the secondary employer; (2) maintain an accident prevention program and send out only employees who are trained to do the work; (3) instruct contract employees in the use of personal protective equipment required for the work to which they are to be assigned; and (4) instruct contract employees that if they reasonably believe a job to which they are assigned by the secondary employer is dangerous, they shall refuse to do the work until the danger is abated, and that such refusal will not result in sanctions against them by the primary employer.

 In *In re Manpower, supra,* No. 98-R4D5-4158, the Board articulated the primary employer's obligation to conduct periodic inspections under Regulations, section 3203, subdivision (a)(4). "[A]bsent unusual mitigating factors the only way to comply with the statutory mandate is not to 'permit any employee to go to or be in a place of employment which is not safe,' and 'to make sure the place has been inspected before a construction worker begins his job at the construction site.' [Citation.] [¶] Section 3203(a) does not explicitly prohibit primary employers from cooperating with secondary employers in fulfilling the duty to inspect the work place, although both retain ultimate responsibility to ensure the inspections are executed. There may, then, be circumstances under which the secondary employer's inspection, on both employer's behalf, may satisfy the duty outlined in section 3203 as long as both employers document compliance, and keep the records as required by section 3203(b)(1)."

The Board found that Sully-Miller did not fulfill its training and inspection obligations when it assigned Moreno, its primary employee, to work under the direct supervision of Manhole, a secondary employer. These findings are binding if supported by substantial evidence. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335 [25 Cal.Rptr.2d 842].) On appeal, we must presume the agency's findings and actions are supported by substantial evidence and the burden is on the appellant to show there is no substantial evidence whatsoever to support the Board's decision. (*Id.* at p. 336.)

Sully-Miller does not challenge the Board's findings but argues that its decision should be reversed because the Division conceded (1) Sully-Miller's injury prevention program was satisfactory as it pertained to its primary employees over whom it had supervision and control, and (2) the regulations do not reference "dual-employer" responsibilities.

With respect to the first so-called concession, we fail to see how it undermines the Board's finding that Sully-Miller violated the Regulation. As the Board found, although the injury prevention program was sufficient had Moreno been working under Sully-Miller's direct supervision, it did not go far enough because Moreno was assigned to work for a secondary employer. Therefore, Sully-Miller was also "obligated to instruct him that he was to refuse to perform any assignment involving a dangerous condition until that condition was abated, but it failed to do so." The Board further found that Sully-Miller failed to "maintain and enforce an inspection program to ensure that Moreno was not exposed to unsafe conditions while working for Manhole, or coordinate with Manhole to see to it that such a program was in place. And it failed to make sure that the Manhole site was inspected before he began work. Finally, it failed to specify in its injury prevention program that it was obligated to provide appropriate training and monitoring for employees assigned to work under the direction of other employers." The evidence supports these findings.

With respect to the second alleged concession relating to dual employment, Sully-Miller relies on testimony by Ramesh Gupta, the Division inspector who cited Sully-Miller. In response to a question posed by counsel for Sully-Miller whether there was "any language in [section] 3203(a)(4) that talks about secondary job sites or primary employers," Gupta responded "[n]ot those words but . . . ." The rest of his testimony was inaudible.

This is essentially the same claim raised in part I.A., and as we have concluded, Sully-Miller forfeited that claim and it has no merit in any event. Moreover, we fail to see the relevancy of Gupta's response. The construction and validity of a regulation is a question of law for the court to determine, not the Division. (*Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd., supra*, 1 Cal.App.4th at p. 643.)

## DISPOSITION

The judgment is affirmed. The Division of Occupational Safety and Health and the Occupational Safety and Health Appeals Board are awarded their costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Nicholson, J., and Cantil-Sakauye, J., concurred.